Rel: June 26, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2025-2026

_____

### CR-2023-0206

_____

## Michael David Belcher

## v.

## State of Alabama

## Appeal from Tuscaloosa Circuit Court
## (CC-16-161.60)

On Application for Rehearing

COLE, Judge.

The opinion issued on August 22, 2025, is withdrawn, and the following is substituted therefor.

Michael David Belcher, an inmate on Alabama's death row, appeals the Tuscaloosa Circuit Court's summary dismissal of his petition for postconviction relief.

Facts and Procedural History

In January 2016, Belcher was indicted for the murder of Samantha Payne,[1] which was made capital because it was committed during the course of a kidnapping. Belcher was convicted of the capital murder of Samantha during a kidnapping, see § 13A-5-40(a)(1), Ala. Code 1975, and, on March 18, 2019, the jury unanimously recommended that Belcher be sentenced to death after also unanimously finding that the murder was "especially heinous, atrocious, or cruel compared to other capital

_____

[1]Four other individuals -- Chylli Bruce, Steven George, Alyssa Watson, and Marcus George -- were also indicted for their roles in Samantha's murder. Belcher v. State, 341 So. 3d 237, 238 n.1 (Ala. Crim. App. 2020). Bruce and Steven George testified at Belcher's trial. "Bruce had pleaded guilty to felony murder in exchange for a 20-year sentence that would be split to require her to serve 5 years in prison." Id. "The circuit court conditionally accepted Bruce's plea and delayed sentencing her until after she testified at her codefendants' trials." Id. "Steven George pleaded guilty to murder in exchange for a sentence of life imprisonment with the possibility of parole." Id. "The court also conditionally accepted Steven's plea and delayed his sentencing." Id.

offenses." (C. 28, 34.)[2] On April 3, 2019, the trial court sentenced Belcher

to death in accordance with the jury's recommendation. (C. 30-52.) On

April 10, 2019, Belcher was appointed postconviction counsel.

The facts of Belcher's crime were set forth in this Court's opinion

affirming Belcher's conviction and sentence on direct appeal as follows:

> "[O]n November 9, 2015, a hunter discovered the nude, decapitated, and decomposed body of Samantha Payne tied to the base of a tree in Talladega National Forest. Samantha's hands were stretched upward and bound to the base of the tree with a leather belt, and 'coaxial cable' was tied around Samantha's wrists. (R. 920.) Her head was approximately 14 feet from her body. Dr. Steven Dunton, a medical examiner with the Alabama Department of Forensic Sciences, testified that because Samantha's body was so decomposed it was impossible for him to determine her exact cause of death. (R. 923.) He said that X-rays revealed that Samantha had fractures to four of her ribs and that those fractures were caused by a 'crushing trauma of some type.' (R. 928.) Samantha was alive, he said, when she was tied to the tree. Dr. Dunton testified that, based on his experience, he did 'not believe' that Samantha died of natural causes. (R. 928.)
>
> "Two of Belcher's codefendants testified in exchange for plea agreements with the State. Chylli Bruce testified that she pleaded guilty to her role in the kidnapping and murder of Samantha and that, as part of that agreement, she agreed to testify truthfully at her codefendants' trials. (R. 464.) She testified that she was a drug addict; that she was using crystal methamphetamine at the time of the murder; that she met

---

[2]"C" refers to the clerk's record in this case. "SC" refers to the supplemental record in this case. "TC" and "TR" refer to the clerk's record and to the reporter's transcript from Belcher's trial.

Belcher when she was 18 years old; and that they 'hung out' together for several months before the murder. (R. 469.) On the night of the murder, Bruce said, she, Belcher, Steven George, Alyssa Watson, and Marcus George were at a place called Wee Racing ('the Shop'), a motorcycle-repair shop that was owned by Belcher's father, when Samantha arrived at around 2:00 a.m. At around 3:00 a.m., Belcher forced Samantha into the backseat of his vehicle and held her down while Bruce drove the vehicle to Belcher's house. Steven, Alyssa, and Marcus[] followed in a separate vehicle. When Belcher got out of his vehicle, Samantha was screaming and Belcher was hitting her in the face. (R. 478.) Instead of going into Belcher's house, they got back into the vehicles and drove to an abandoned trailer on Highway 82. According to Bruce:

> "'[Samantha] is taken out of the car. [Belcher] is trying to tie her up in the back seat, but she won't be still. So I place my foot on her face, and I guess he's tying her up with the belt or something. The next thing I remember she's laying on the ground, she's tied up. I'm asked to take her fingernails off.'

"(R. 480.) Bruce got a knife and 'popped' off Samantha's artificial fingernails (R. 480), Belcher and Marcus beat and kicked her, and then they put Samantha into the trunk of one of the vehicles and drove to Talladega National Forest. At one point, Samantha fell out of the trunk when the vehicle hit a pothole, and Bruce helped Belcher put Samantha back into the trunk and they drove into the forest. Bruce testified:

> "'We come to a bridge. Marcus says that -- tells [Belcher] that we're going to have to kill her. [Belcher] says that we will have to. So we get back on the road, and we keep going into this forest. We run out of gas.'

"(R. 484.) At that point, Marcus and Alyssa drove past them in their vehicle. Belcher and Steven then took Samantha out

4

of the trunk and led her into the forest. Shortly thereafter, Bruce said, Steven returned and she and Steven walked to a campsite and called Steven's brother to bring them gas. After Bruce and Steven put gas in the car and tried to leave, police arrived. Belcher's vehicle was searched, and Bruce was arrested, charged with possession of drug paraphernalia, and taken to jail. About four days after she was released from jail, Bruce said, she saw Belcher and he confessed to her that he had killed Samantha by stabbing her.

"Steven testified that he pleaded guilty to murder in exchange for his testimony at his codefendants' trials. He testified that in September 2015, he started spending a lot of time with Belcher and the two would hang out together and 'do drugs' at the Shop. (R. 547.) On the evening of November 1, 2015, Belcher, Marcus, Alyssa, and Samantha were at the Shop. Steven said that he took Samantha's vehicle when she went to the bathroom and left her keys on a counter. He and Marcus drove down Highway 219, but he decided that he wanted the vehicle's catalytic converter, so he drove back to the Shop. After removing the catalytic converter, he set the vehicle on fire. He and Marcus then went to Belcher's house so that he could change clothes. When they returned to the Shop, Steven said, Belcher and Bruce were in Belcher's vehicle and were driving away from the Shop. They followed them to Belcher's house. Belcher pulled Samantha from the backseat of his vehicle and started kicking and slamming Samantha into the floor. Samantha's face was bleeding badly. (R. 562.) The group then got into two vehicles and drove to an abandoned trailer and house. (R. 563.) When they arrived, Belcher continued to kick and stomp Samantha in the face. Belcher told Steven to get something he could use to tie up Samantha, so Steven went and got some cable wire from the trailer. Samantha was crawling around and telling them that she 'loved them' and that she would not tell anyone what they had done. (R. 565.) Belcher, Bruce, and Steven then left in Belcher's vehicle with Samantha in the trunk and Belcher driving. Samantha fell out of the trunk and Belcher stopped.

5

Bruce helped Belcher put Samantha back in the trunk. Belcher said that he knew a place that they could take her, and they headed to the Talladega National Forest. They ran out of gas. According to Steven:

> "'And then [Belcher] said, "We got to get her out of the car." So he gets her out of the car, starts dragging her in the woods. [Belcher] told me to come help him. So I get out of the car, go help him drag her in the woods.'

"(R. 572.)

> "'[S]he kept trying to get loud with him. So [Belcher] started stomping her in the face. Said, Shut up. If you don't shut up, I'm going to kill you. He told me to get some more rope out of the car. So I was fixing to go get -- He said, Well, hand me your knife. I gave him the knife, and I went to the car. When I got to the car, [Bruce] was already walking back. I told [Bruce] to get in the car. I got the car cranked up. It might have went a few feet and cut off. Then me and her went up the hill to the firing -- shooting range. We got in a conversation with the game wardens, asking for some gas. They didn't have no gas, so we kept walking. So I got up the road.'

"(R. 575.) The last time he saw Samantha, Steven said, she was fully dressed and alive.

"Deputy Enoch Rose of the Hale County Sheriff's Department testified that he was dispatched to Talladega National Forest on November 2, 2015, in response to an emergency 911 call that 'somebody was up there, supposedly one of Tuscaloosa County's most wanted ... and that subject was up there walking on the road and asking for gas.' (R. 615.) He approached a vehicle and found Steven and Bruce. Deputy

6

Rose said that he verified with dispatch that the vehicle belonged to Belcher. After searching the vehicle and the surrounding area, he found a knife near the passenger side front tire of the vehicle. (R. 627.) That knife was identified as belonging to Steven and as the knife that Steven said he gave to Belcher before Samantha was taken into the forest.

"....

"James Harvey testified that on the morning of November 2, 2015, Lauren [Harvey] telephoned him and said that a 'half-naked man' was beating on her door and trying to get into her house. (R. 655.) He lived about four miles from Lauren, so he got into his vehicle and drove to her house. As Harvey approached Lauren's driveway, he said, Lauren called him. The man had left her house, and she told Harvey the direction that the man was walking. Harvey found a man, who he identified at trial as Belcher, sitting on the guardrail of a bridge. He said that Belcher had no shirt and had scratches all over him, and that there was a 'red tint' to his hands that Harvey believed was some type of blood. (R. 662.) Harvey said that Belcher told him that his friends had played a trick on him; that they had left him in the woods; and that he had been walking all night. Harvey drove Belcher to a local store. Lauren called Harvey and told him that deputies wanted to talk to Belcher. Harvey said that he then drove Belcher back to where he had picked up Belcher and that deputies were waiting for them.

"Lieutenant Al Jackson with the Tuscaloosa County Sheriff's Office testified that he was called to South Sandy Road in response to a call about a 'wanted person.' (R. 668.) When he arrived, he found a vehicle on the side of the road and two people in custody, Steven and Bruce. While there he received another call from dispatch regarding a person knocking on doors on Bear Creek Road. Eventually, he met up with Harvey; a man who he identified as Belcher was in the

7

car with Harvey. Belcher had no shirt on, was wearing shorts, and had 'scratches on him, like briar scratches.' (R. 675.)

"Investigator J.C. Bryant of the Tuscaloosa Police Department testified that he was called to the scene when a body was discovered in Talladega National Forest on November 9, 2015. He said that, after he learned that Steven and Bruce had been detained a week earlier in the general area where the body was found, he spoke to Steven, who was still in police custody. He said that Steven told him what had happened to Samantha, and he then interviewed Belcher on November 9, 2015. Belcher denied all involvement in Samantha's murder. On November 10, 2015, Inv. Bryant obtained a search warrant for Belcher's house. As a result of the search, he discovered a car battery inside a clothes dryer.

"Investigator Richard Wilkins of the Tuscaloosa Police Department testified that he was the lead investigator into Samantha's death. He testified that a search was conducted at the location where Steven and Bruce said that Samantha had first been tied up. The cable retrieved from that location was consistent, he said, with the cable wire that had been used to tie Samantha's wrists.

"A forensic biologist with the Alabama Department of Forensic Sciences, Hannah Payne, testified that she conducted biological tests on swabs and clothing that had been collected from the crime scene and sent to her office. She testified that Belcher's DNA was found on the handle of Steven's pocketknife (R. 896), and that Samantha's blood was found on a jacket that had been taken from Belcher's vehicle and on Steven's shirt.

"Belcher's defense was that, although he participated in the events that ultimately led to Samantha's murder, Steven was the person who actually killed her. Belcher testified on his own behalf that on the evening of November 1, 2015, he was at the Shop working on a customer's motorcycle when he

8

'looked up' and saw Samantha. (R. 957.) He was surprised, he said, to see her because he had already told her not to have any contact with him. Belcher said that he, Steven, Marcus, Alyssa, and Bruce were 'snorting methamphetamine.' (R. 959.) Sometime later, he said, Samantha 'stormed' into where he had been working and asked him what happened to her vehicle because it was missing from the Shop. (R. 960.) He said that the 'others' had a 'violent argument' with Samantha and that Alyssa and Bruce physically attacked Samantha. (R. 963.) They all drove to his house, Belcher said, and all the others, except himself, were debating about what to do with Samantha. He testified that Steven and Bruce pulled Samantha from the car and started punching and stomping her face. He watched it all happen and did not intervene to help Samantha. According to Belcher, Marcus handed Steven a hammer, Steven hit Samantha in the head, and then they put Samantha in a vehicle and took her to [Alyssa's] father's house off Highway 82. He testified:

> "'Steven opens the trunk up. And me and Steven take [Samantha] out of the trunk. [Bruce is] still in the car. Me and Steven are still arguing. And it's -- we didn't just leave her in the middle of the road. We sat her a few feet off on the edge of the woods in the bushes. At that point, Steven was walking around the car. I turn around and walk back off up the road the way we had just came in. I didn't know where I was at. I didn't know where the road led to. I knew we came in the way we came in, and I just walked. I continued to walk, took several different roads; but I didn't remember where we come from. It was daylight at this point.'

"(R. 975.) A man picked him up, he said, and took him to a store. Shortly thereafter, he was taken into custody. On cross-examination, Belcher said that he just 'followed the crowd.' (R. 990.)

9

"At the penalty phase of the trial, Belcher called several witnesses to testify in mitigation. Deputy Mike Byars of the Tuscaloosa County Sheriff's Office testified that while incarcerated Belcher had been a well-behaved inmate. Dr. Randall Griffith, a psychologist, testified that he conducted a neuropsychological evaluation of Belcher and that he interviewed Belcher at the Tuscaloosa County jail. It was his opinion that Belcher suffered from a 'mild neuro-cognitive disorder,' which, he said, means that Belcher had 'some degree of impairment in one area of his thinking ability.' (R. 1109.) Belcher also presented the testimony of several family members who said that Belcher was a doting father, that he was a kind and loving person, and that he loved animals. Belcher's mother testified that since Belcher had been arrested his faith had grown and that when she spoke to him they frequently prayed together."

Belcher v. State, 341 So. 3d 237, 249-54 (Ala. Crim. App. 2020) (footnotes omitted).

On direct appeal, this Court affirmed Belcher's conviction and sentence. See Belcher, supra. On May 21, 2021, after the Alabama Supreme Court denied Belcher's petition for a writ of certiorari, this Court issued a certificate of judgment.

Belcher filed his first direct-appeal brief on February 14, 2020, and he filed the instant postconviction petition on May 12, 2021, during the pendency of his direct appeal, after paying the filing fee and receiving a single, 90-day extension from the circuit court as permitted by the Fair

Justice Act ("the FJA"), § 13A-5-53.1, Ala. Code 1975.[3] (C. 53.) The State filed its answer to Belcher's petition on July 6, 2021, and moved the circuit court to summarily dismiss the petition on the grounds that Belcher's claims were insufficiently pleaded and meritless. Belcher submitted a response and opposition to the State's answer on August 31, 2021. On September 18, 2021, Belcher sought leave to amend the first claim in his petition. The State moved to strike the proposed amendment, contending that it failed to satisfy the successive-petition requirement established by the FJA.

On September 30, 2021, the circuit court held a hearing on the State's motion to dismiss and Belcher's request for leave to amend his petition. The same judge who had presided over Belcher's trial presided over the postconviction proceedings, and, on February 15, 2023, the circuit court entered an extensive order summarily dismissing Belcher's petition for postconviction relief without an evidentiary hearing because, it determined, the claims therein were insufficiently pleaded, meritless, or both. This appeal follows.

---

[3]Because Belcher was sentenced to death after August 2017, his postconviction efforts were governed by the FJA. See § 13A-5-53.1, Ala. Code 1975.

11

## Standard of Review

It is well settled that a circuit court may summarily dismiss a postconviction petition pursuant to Rule 32.7(d), Ala. R. Crim. P.,

> "[i]f the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings ...."

See also Hannon v. State, 861 So. 2d 426, 427 (Ala. Crim. App. 2003); Cogman v. State, 852 So. 2d 191, 193 (Ala. Crim. App. 2002); Tatum v. State, 607 So. 2d 383, 384 (Ala. Crim. App. 1992).

> "'[W]here there are disputed facts in a postconviction proceeding and the circuit court resolves those disputed facts, "[t]he standard of review on appeal ... is whether the trial judge abused his discretion when he denied the petition."' Boyd v. State, 913 So. 2d 1113, 1122 (Ala. Crim. App. 2003) (quoting Elliott v. State, 601 So. 2d 1118, 1119 (Ala. Crim. App. 1992)). However, 'when the facts are undisputed and an appellate court is presented with pure questions of law, that court's review in a Rule 32 proceeding is de novo.' Ex parte White, 792 So. 2d 1097, 1098 (Ala. 2001). 'The sufficiency of pleadings in a Rule 32 petition is a question of law' and is reviewed '"de novo."' Ex parte Beckworth, 190 So. 3d 571, 573 (Ala. 2013) (quoting Ex parte Lamb, 113 So. 3d 686, 689 (Ala. 2011)). Moreover, when a trial court makes its judgment 'based on the cold trial record,' we apply a de novo standard of review. Ex parte Hinton, 172 So. 3d 348, 352 (Ala. 2012)."

Harris v. State, 365 So. 3d 1075, 1089 (Ala. Crim. App. 2021).

Some of Belcher's claims were summarily dismissed on the ground that they were insufficiently pleaded.

"Rule 32.3, Ala. R. Crim. P., states that '[t]he petitioner shall have the burden of pleading ... the facts necessary to entitle the petitioner to relief.' Rule 32.6(b), Ala. R. Crim. P., states that '[t]he petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.' As this Court noted in Boyd v. State, 913 So. 2d 1113 (Ala. Crim. App. 2003):

"'"Rule 32.6(b) requires that the petition itself disclose the facts relied upon in seeking relief." Boyd v. State, 746 So. 2d 364, 406 (Ala. Crim. App. 1999). In other words, it is not the pleading of a conclusion "which, if true, entitle[s] the petitioner to relief." Lancaster v. State, 638 So. 2d 1370, 1373 (Ala. Crim. App. 1993). It is the allegation of facts in pleading which, if true, entitle a petitioner to relief. After facts are pleaded, which, if true, entitle the petitioner to relief, the petitioner is then entitled to an opportunity, as provided in Rule 32.9, Ala. R. Crim. P., to present evidence proving those alleged facts.'

"913 So. 2d at 1125.

"'The burden of pleading under Rule 32.3 and Rule 32.6(b) is a heavy one. Conclusions unsupported by specific facts will not satisfy the requirements of Rule 32.3 and Rule 32.6(b). The full factual basis for the claim must be included in the petition itself. If, assuming every factual allegation in a Rule 32 petition to be true, a court

13

cannot determine whether the petitioner is entitled to relief, the petitioner has not satisfied the burden of pleading under Rule 32.3 and Rule 32.6(b). See Bracknell v. State, 883 So. 2d 724 (Ala. Crim. App. 2003).'

"Hyde v. State, 950 So. 2d 344, 356 (Ala. Crim. App. 2006).

"'Although postconviction proceedings are civil in nature, they are governed by the Alabama Rules of Criminal Procedure. See Rule 32.4, Ala. R. Crim. P. The "notice pleading" requirements relative to civil cases do not apply to Rule 32 proceedings. "Unlike the general requirements related to civil cases, the pleading requirements for postconviction petitions are more stringent...." Daniel v. State, 86 So. 3d 405, 410-11 (Ala. Crim. App. 2011). Rule 32.6(b), Ala. R. Crim. P., requires that full facts be pleaded in the petition if the petition is to survive summary dismissal. See Daniel, supra. Thus, to satisfy the requirements for pleading as they relate to postconviction petitions, Washington was required to plead full facts to support each individual claim.'

"Washington v. State, 95 So. 3d 26, 59 (Ala. Crim. App. 2012). 'The pleading requirements of Rule 32 apply equally to capital cases in which the death penalty has been imposed.' Taylor v. State, 157 So. 3d 131, 140 (Ala. Crim. App. 2010)."

Harris, 365 So. 3d at 1089-90.

The circuit court also summarily dismissed some of Belcher's claims on the merits. Importantly, the circuit judge who ruled on Belcher's postconviction petition was the same judge who had presided over

14

Belcher's capital-murder trial. When the judge who rules on a petition is the "same judge who presided over [the] trial," the judge has personal knowledge of facts underlying the allegations and has had the "'opportunity to observe counsel's performance throughout the proceedings.'" Partain v. State, 47 So. 3d 282, 286 (Ala. Crim. App. 2008). It is well settled that a judge may summarily dismiss a claim, including an ineffective-assistance-of-counsel claim, without further proceedings based on his own personal knowledge. Id. (citing Ex parte Walker, 800 So. 2d 135 (Ala. 2000)). See also Harris, 365 So. 3d at 1090 ("This is true even with respect to claims of ineffective assistance of counsel."). Indeed,

> "'[n]either this Court nor the Alabama Supreme Court has ever held that an evidentiary hearing must be conducted on every postconviction petition that raises a claim of ineffective assistance of counsel. Such a requirement would burden an already overburdened judiciary. "An evidentiary hearing on a coram nobis petition [now Rule 32 petition] is required only if the petition is 'meritorious on its face.' Ex parte Boatwright, 471 So. 2d 1257 (Ala. 1985)." Moore v. State, 502 So. 2d 819, 820 (Ala. 1986).'

"Jackson v. State, 133 So. 3d 420, 444-45 (Ala. Crim. App. 2009). See also Ex parte Hill, 591 So. 2d 462, 463 (Ala. 1991) ('[A] judge who presided over the trial or other proceeding and observed the conduct of the attorneys at the trial or other proceeding need not hold a hearing on the effectiveness of those attorneys based upon conduct that he observed.'); and

15

> Partain v. State, 47 So. 3d 282, 286 (Ala. Crim. App. 2008) ('[A] circuit judge who has personal knowledge of the facts underlying an allegation of ineffective assistance of counsel may summarily deny that allegation based on the judge's personal knowledge of counsel's performance.')."

Harris, 365 So. 3d at 1089-90.

Finally, "[w]ith certain exceptions not applicable here, 'this Court may affirm the judgment of the circuit court for any reason, even if it is not for the reason stated by the circuit court.'" Harris, 365 So. 3d at 1091 (quoting Acra v. State, 105 So. 3d 460, 464 (Ala. Crim. App. 2012)).

## Analysis

Belcher asserts six general arguments on appeal: that the circuit court erred by summarily dismissing his claim that Juror J.D.H. committed misconduct by failing to disclose his son's criminal convictions, that the circuit court erred by refusing to equitably toll the deadline to amend his petition, that the circuit court erred by summarily dismissing his claims that counsel rendered ineffective assistance during the penalty phase of his capital-murder trial, that the circuit court erred by summarily dismissing his claims that counsel rendered ineffective assistance at the guilt phase of his capital-murder trial, that the circuit court erred by failing to grant him discovery, and that application of the

16

FJA deprived him of a fair opportunity to obtain postconviction relief. None of these arguments entitles Belcher to relief.

## I.     Juror-Misconduct Claim

Belcher first contends that the circuit court erred by summarily dismissing his postconviction claim that "Juror J.D.H. failed to disclose, in response to multiple questions on the [juror] questionnaire, that his son, P.D.H., had been arrested four times in the year leading up to Belcher's trial." (Belcher's brief, p. 10.)  More specifically, the juror questionnaire, completed on March 5, 2019, asked if "you, a family member or relative, or a close friend" had "ever been involved in a criminal case as a defendant, victim, witness, or complainant," and J.D.H. responded "no."  (C. 57; J.D.H.'s juror questionnaire.)  The questionnaire also asked if "you or a family member or relative or close friend" had "ever been arrested for or charged with an offense other than a simple traffic violation," and J.D.H. responded affirmatively, but he stated "only that he personally had been charged with a crime that was not a felony." (C. 57; J.D.H.'s juror questionnaire.)  Finally, when asked if he personally knew "anyone who has been convicted or pleaded guilty to a crime," J.D.H. responded "yes," but he left the section blank that

asked prospective jurors who responded affirmatively to state "each person, ... that person's relationship to you and the name of the crime and sentence imposed, including probation." (C. 57-58; J.D.H.'s juror questionnaire.)

According to Belcher, J.D.H. failed to include the following information about his son on the juror questionnaire: "[o]n March 15, 2018, J.D.H.'s son, P.D.H., was arrested in Jefferson County for first-degree theft of property" and was released on bond on March 26, 2018; "[o]n March 26, 2018, P.D.H. was arrested for third-degree burglary in Tuscaloosa County and placed in the Tuscaloosa County Jail and was released on bond on May 8, 2018; "[o]n July 21, 2018, P.D.H. was arrested for public intoxication in Tuscaloosa County and was released on bond the next day"; and "[o]n August 14, 2018, P.D.H. was arrested for carrying a pistol without a permit in Tuscaloosa County and was released on bond." (C. 57-58.) Belcher further alleged that, "[o]n August 18, 2018, this Court revoked P.D.H.'s bond on the burglary charge" and that he was "placed back in the Tuscaloosa County Jail on August 27, 2018." (C. 58.) "On October 25, 2018, P.D.H. [pleaded] guilty to the burglary and was sentenced to 46 months split with 6 months to serve in the county jail,"

18

and to 90 days on the pistol charge, which was ordered to run concurrently. (C. 58.) "On January 22, 2019, P.D.H. was released from jail and placed on probation." (C. 58.) Belcher then contended in his petition that defense counsel "would have used a peremptory strike to remove [J.D.H.] from the jury" had he known about P.D.H.'s arrests and convictions. (C. 59.) In support of this contention, Belcher noted that counsel struck "several other jurors who disclosed that their family members had been charged with crimes." (C. 59 (citing C.C.'s, M.H.'s, T.T.'s, T.C.'s, and E.J.'s juror questionnaires).) According to Belcher, "[n]o one who disclosed that they had a relative who had been convicted of a felony served on the jury." (C. 59.)

Belcher further contended in his petition that if counsel had known about P.D.H.'s arrests and convictions, counsel would have also learned that P.D.H. and Belcher had been housed in the same cell and had a dispute, which resulted in the changing of cells and Belcher and P.D.H. avoiding each other, which, he said, jail records and a witness, James Wilson, could have confirmed. Belcher also alleged that, because the address listed for P.D.H. in court records was the same address listed for J.D.H. on the venire list, "J.D.H. and P.D.H. lived together at the time of

19

Belcher's trial." (C. 60.) Belcher then speculated that "there is a reasonable likelihood that P.D.H. discussed his interactions with Belcher at the jail with J.D.H. before or during Mr. Belcher's trial." Belcher complained that this "extraneous information also violates [his] rights to a fair trial and an impartial jury." (C. 60.)

In its order summarily dismissing Belcher's petition, the circuit court found that this juror-misconduct claim was insufficiently pleaded and "merely speculative." (C. 706-07.) We agree that Belcher did not meet his burden of pleading his juror-misconduct claim with specific facts that, if true, would entitle him to an evidentiary hearing.

"The proper standard for determining whether juror misconduct warrants a new trial ... is whether the misconduct might have prejudiced, not whether it actually did prejudice, the defendant." Ex parte Dobyne, 805 So. 2d 763, 771 (Ala. 2001). However, we need not consider whether Belcher pleaded facts that, if true, might have prejudiced him had they been known because Belcher did not plead any facts to show that J.D.H. was aware of P.D.H.'s criminal history and interactions with Belcher, much less that he failed to answer the questionnaire truthfully. Belcher alleged that P.D.H. was arrested and convicted for crimes near the time

20

of Belcher's trial, in 2018 and 2019, and, moreover, that P.D.H., for a time, shared a cell and had "negative" interactions with Belcher. Belcher even alleged that had counsel known this information they would have used a peremptory challenge or even struck J.D.H. for cause. However, these allegations rest on layers of speculation.

"First and foremost, when pursuing a claim of juror misconduct, the [defendant] must establish the misconduct actually occurred." Jackson v. State, 133 So. 3d 420, 441 (Ala. Crim. App. 2009). "'A defendant [seeking relief] on the basis of juror misconduct has the initial burden to prove that a juror or jurors did in fact commit the alleged misconduct.'" Id. (quoting Dawson v. State, 710 So. 2d 472, 475 (Ala. 1997)). "Parties ... are entitled to true and honest answers to their questions on voir dire." Ex parte Dobyne, 805 So. 2d at 771. But, for any juror misconduct to occur, the juror must first know about the information and fail to truthfully disclose it. Id. Belcher, however, never alleges that J.D.H. was aware of P.D.H.'s alleged recent arrests and convictions. Rather, he speculates that J.D.H. was aware based on his familial relationship to P.D.H. and the fact that P.D.H. had provided his father's address on an unknown document and his further speculation that P.D.H.'s having

21

provided his father's address meant that they actually lived together.  (C. 60.)  Here, Belcher never alleges that J.D.H. was aware of any of his son's arrests, much less that P.D.H. had told him about interactions with Belcher in jail.  Rather, Belcher speculates that J.D.H. was aware of P.D.H.'s arrests based on unspecified "court records" indicating that P.D.H. had provided the same address that J.D.H. provided as a juror and that he "believed" they lived together.  (C. 60.)  Belcher does not allege that J.D.H. actually knew about P.D.H.'s criminal difficulties, such as by alleging that he posted P.D.H.'s bond or paid for his counsel or appeared at hearings with P.D.H.  Rather, Belcher speculates that, because P.D.H. provided his father's address as his residence in a court record, P.D.H. must have lived with his father and, further, that his father must have been aware of those arrests.  This is pure speculation. Belcher alleged no facts to show that J.D.H. knew P.D.H.'s criminal history, much less that J.D.H. was aware of P.D.H.'s alleged interactions with Belcher, particularly when the petition notes that at least one of the arrests occurred in a different county.  (C. 58.)   See Brownfield v. State, 266 So. 3d 777, 792-93 (Ala. Crim. App. 2017) ("'Unless a juror is asked a question which applies to him in a manner demanding response, it is

permissible for a juror to remain silent; the juror is under no duty to disclose.'"(quoting Parish v. State, 480 So. 2d 29, 30 (Ala. Crim. App. 1985))). It is also notable that J.D.H. was forthcoming during voir dire when asked if anyone had seen or heard information about the case, stating that he had hunted in the area and had heard rumors from others about the case, which he explained in detail. He explained that the information he had heard or read about was "around the time that … [i]t happened," but not since that time. (TR. 196.) He indicated that he did not know of anything that would affect his ability to be fair and impartial and that he could set aside any extraneous "scuttlebutt" he had heard. J.D.H. further stated during voir dire that he did not know any of the people involved personally and had no opinion about what happened, making Belcher's speculations that J.D.H. knew about his son's negative interactions with Belcher even less likely. Belcher simply did not plead any facts that J.D.H. was, in fact, aware of any criminal matters regarding P.D.H., much less that J.D.H. was aware of his son's alleged acquaintance with Belcher from jail. Belcher thus failed to plead facts that, if true, showed juror misconduct.

Second, "[t]he form of prejudice that would entitle a party to relief for a juror's nondisclosure or falsification in voir dire would be its effect, if any, to cause the party to forgo challenging the juror for cause or exercising a peremptory challenge to strike the juror." Ex parte Dobyne, 805 So. 2d at 772. Again, Belcher failed to plead facts that, if true, indicate that he might have been prejudiced. Indeed, Belcher never pleaded, including in his response to the State's motion to dismiss, that trial counsel would have followed up with additional questions if J.D.H. had disclosed his son's criminal history on the juror questionnaire. Belcher alleged no facts to support his speculation that, if J.D.H. had elaborated and provided information about the recent arrests of his son on his questionnaire, trial counsel would have inquired further, much less that they would have discovered any negative information about Belcher. See generally Mashburn v. State, 148 So. 3d 1094, 1125 (Ala. Crim. App. 2013) ("Speculation is not sufficient to satisfy a Rule 32 petitioner's burden of pleading."). Indeed, the trial record refutes such speculation.

Trial counsel asked numerous questions during voir dire but never asked the prospective jurors about whether any of them or their family

members or close friends had ever been arrested, charged, or convicted of crimes or asked <u>additional</u> questions of those who had responded affirmatively to these questions on their juror questionnaires. (TR. 335-55.) Belcher's counsel did not ask jurors G.L., L.L., M.P., or P.S.[4] any follow-up questions during voir dire about the affirmations in their questionnaires that they had family members who had been arrested and/or convicted of crimes. Thus, even if J.D.H. was aware of and had disclosed P.D.H.'s arrests, there is nothing in the record to suggest that counsel would have then asked J.D.H. questions about his son's arrests, much less that further questioning would have elicited the alleged "negative" information P.D.H. had about Belcher, even assuming that P.D.H. had actually lived with J.D.H. and, moreover, assuming that P.D.H. had shared this negative information with J.D.H. <u>See</u> <u>Brownfield</u>, 266 So. 3d at 794 ("That counsel did not question half of the venire about whether anyone had been a crime victim strongly indicates that counsel did not believe that being a crime victim was a material consideration.").

---

[4]There was no P.M. on the jury; thus, although the circuit court's order dismissing Belcher's petition refers to P.M., it appears that the circuit court was referring to P.S., the only juror whose first name began with a "P." (TR. 382.)

25

Belcher's counsel also did not challenge other jurors who had reported familial or personal criminal histories in their questionnaires[5] -- namely, G.L., L.L., M.P., and P.S. (C. 707; Juror questionnaires.) See Brownfield, 266 So. 3d at 794 ("Although rarely is the answer to a single question during voir dire dispositive when selecting a jury, the fact that the information not disclosed by the juror in question had been disclosed

_____

[5]Although Belcher notes in his brief that he struck five prospective jurors who noted that family members had been convicted of crimes (C.C., M.H., T.T., T.C., and E.J.), as already stated, those prospective jurors were not the only ones with family members who had been arrested or convicted of crimes. Moreover, those prospective jurors' responses strongly suggest that they were struck by the defense for reasons other than their family members' criminal history. C.C. indicated that she was strongly in favor of the death penalty and that, "[i]f someone kills someone, I don't feel that they should get to live"; E.J. was also strongly in favor of the death penalty, stating that "[i]f you kill someone in Cold Blood, why should we feed and clothe them for years" and that drug use could increase her likelihood of voting for the death penalty"; and C.C. and E.J. were individually questioned about their responses regarding the death penalty during voir dire. (See Juror questionnaires; TR. 248, 258-63.) M.H., T.T., and T.C. identified as politically conservative churchgoers; M.H. had family and/or friends who had worked in law enforcement; T.T. said that he was "very conservative and during voir dire responded that when he saw Belcher he wondered what Belcher had done"; and T.C. wrote that a defendant might be hiding something if he chose not to testify. (See Juror questionnaires.) And, although Belcher notes in his brief that counsel used its final strike on M.P., making her an alternate, M.P. had identified as politically conservative and stated in her questionnaire that it is "odd" for someone to not want to "explain or defend yourself."

by another juror who was not struck by defense counsel certainly undermines any claim that the nondisclosed information was material to counsel when selecting the jury.").

Finally, J.D.H. responded "yes" to the question regarding whether he knew anyone who had been convicted of or had pleaded guilty to a crime but did not elaborate in the space provided, as instructed. Thus, trial counsel was aware that J.D.H. knew someone who had been convicted of or had pleaded guilty to a crime.[6] If counsel desired further information about this in striking the jury, trial counsel could have asked J.D.H. during voir dire but did not. Counsel could have asked whether J.D.H. did not elaborate because he was referring to himself, which he had already explained in responses to the two previous questions regarding whether he or a family member had ever been arrested or convicted, or whether J.D.H. was referring to another family member and, if so, counsel could have asked this person's identity and the details

---

[6]On his juror questionnaire, J.D.H. noted that he had been arrested and had pleaded guilty to a misdemeanor, not a felony, in the past and that he had a son who worked in construction; and he responded "yes" to whether he knew someone who had been convicted or had pleaded guilty to a crime, but he did not state to whom he was referring or when and where this occurred.

of their conviction. (Juror questionnaire, questions 29, 30, 32.) See, e.g., Jones v. State, 753 So. 2d 1174, 1203 (Ala. Crim. App. 1999) (rejecting a juror-misconduct claim partly because "Jones had been informed that J.M. knew the victims and counsel could have explored during voir dire examination the basis of that knowledge").

In sum, it was Belcher's burden to plead facts that, if true, entitled him to relief, and Belcher failed to meet this burden, merely speculating that J.D.H. was likely aware of P.D.H.'s recent arrests and convictions, that J.D.H. and P.D.H. likely lived together, that P.D.H. had likely shared his jail experiences with his father, and that, had J.D.H. provided his son's criminal history on the juror questionnaire, counsel likely would have asked for additional details and then likely discovered that P.D.H. had once shared a jail cell with Belcher and that they had negative interactions. The circuit court thus properly summarily dismissed this claim.

## II.    Equitable Tolling

Belcher next contends that the circuit court erred by not accepting an amendment to his petition in which he alleged a new juror-misconduct claim regarding a different juror. Belcher argues that he was entitled to

"equitable tolling of the deadline to amend" and that the court's refusal to allow his amendment violated his constitutional "rights to due process, equal protection, meaningful review of his capital conviction and death sentence, and effective assistance of postconviction counsel in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Alabama law." (Belcher's brief, p. 23.)

On September 17, 2021, approximately four months after filing his petition for postconviction relief, Belcher filed an amendment to Claim I of his petition, arguing that the COVID-19 pandemic had prevented him "from conducting the investigation necessary to uncover the juror misconduct claim that he presents in this amendment," and that equitable tolling was therefore warranted, and requesting that the circuit court accept his amendment. (C. 526-33.) The State moved to strike Belcher's amendment, contending that, under the FJA and Rule 32.2(b), Ala. R. Crim. P., Belcher's amendment should not be permitted. (C. 535-36.) In its order summarily dismissing Belcher's petition, the circuit court denied Belcher's amendment, finding that, under the FJA, amendments are to be treated as successive petitions and that Belcher had not met the requirements for filing a successive petition. (C. 705.)

29

We agree with the circuit court that Belcher did not satisfy the requirements for filing a successive petition and further hold that the circuit court did not err by not applying the doctrine of equitable tolling. Equitable tolling is applicable neither to amendments nor to the filing deadline under the FJA, and Belcher has also waived any argument that the circuit court's refusal to accept his amendment violated his constitutional rights.[7]

In 2017, the FJA statutorily established the procedures governing postconviction proceedings for criminal defendants who are convicted of capital murder and sentenced to death after August 1, 2017. See Ex parte

---

[7]Belcher merely makes a one-sentence contention that, by not allowing his amendment, the circuit court "violated his rights to due process, equal protection, meaningful review of his capital conviction and death sentence, and effective assistance of postconviction counsel in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Alabama law." He gives no explanation as to the applicable content of these constitutional provisions or how they were violated. Rule 28(a)(10), Ala. R. App. P., requires that an appellate argument must contain "the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." "'[A]rguments that do not comply with Rule 28(a)(10), Ala. R. App. P., are deemed waived.'" Wimbley v. State, 387 So. 3d 213, 256 (Ala. Crim. App. 2022) (quoting Hooks v. State, 141 So. 3d 1119, 1124 (Ala. Crim. App. 2013)). This argument by Belcher does not comply with Rule 28(a)(10); accordingly, the "argument" is waived on appeal.

Marshall, 323 So. 3d 1188, 1190 (Ala. 2020) ("The FJA governs petitions for postconviction relief under Rule 32, Ala. R. Crim. P., in death-penalty cases."). The FJA provides:

"(a) Rule 32.2(c) of the Alabama Rules of Criminal Procedure shall not apply to cases in which a criminal defendant is convicted of capital murder and sentenced to death, and files a petition for post-conviction relief under the grounds specified in Rule 32.1(a), (e), or (f) of the Alabama Rules of Criminal Procedure.

"(b) Post-conviction remedies sought pursuant to Rule 32 of the Alabama Rules of Criminal Procedure in death penalty cases shall be pursued concurrently and simultaneously with the direct appeal of a case in which the death penalty was imposed. In all cases where the defendant is deemed indigent or as the trial judge deems appropriate, the trial court, within 30 days of the entry of the order pronouncing the defendant's death sentence, shall appoint the defendant a separate counsel for the purposes of post-conviction relief under this section. ...

"(c) A circuit court shall not entertain a petition for post-conviction relief from a case in which the death penalty was imposed on the grounds specified in Rule 32.1(a) of the Alabama Rules of Criminal Procedure unless the petition, including any amendments to the petition, is filed within 365 days of the filing of the appellant defendant's first brief on direct appeal of a case in which the death penalty was imposed pursuant to the Alabama Rules of Appellate Procedure.

"(d) A circuit court, before the filing date applicable to the defendant under subsection (c), for good cause shown and after notice and an opportunity to be heard from the Attorney General, or other attorney representing the State of Alabama,

31

may grant one 90-day extension that begins on the filing date applicable to the defendant under subsection (c).

"(e) Within 90 days of the filing of the state's answer to a properly filed petition for post-conviction relief, the circuit court shall issue an order setting forth those claims in the petition that should be summarily dismissed and those claims, if any, that should be set for an evidentiary hearing. If the properly filed petition for post-conviction relief is still pending at the time of the issuance of the certificate of judgment on direct appeal, the court in which the petition is pending shall issue a final order on the petition or appeal within 180 days.

"(f) If post-conviction counsel files an untimely petition or fails to file a petition before the filing date applicable under this section, the circuit court shall direct post-conviction counsel to show good cause demonstrating extraordinary circumstances as to why the petition was not properly filed. After post-conviction counsel's response, the circuit court may do any of the following:

"(1) Find that good cause has been shown and permit counsel to continue representing the defendant and set a new filing deadline for the petition, which may not be more than 30 days from the date the court permits counsel to continue representation.

"(2) Find that good cause has not been shown and dismiss any untimely filed petition.

"(3) Appoint new and different counsel to represent the defendant and establish a new filing deadline for the petition, which may not be more than 270 days after the date the circuit court appoints new counsel. In the instance that this subdivision is applicable and new counsel is

32

appointed, the circuit court in which the petition is pending shall issue a final order on the petition or appeal within 180 days of the filing of the petition.

"(g) The time for filing a petition for post-conviction relief under Rule 32.1(f) in a case in which the death penalty was imposed shall be six months from the date the petitioner discovers the dismissal or denial, irrespective of the deadlines specified in this section. This provision shall not extend the deadline of a previously filed petition under Rule 32.1 of the Alabama Rules of Criminal Procedure.

"(h) Any petition for post-conviction relief filed pursuant to this section after the filing date that is applicable to the defendant under this section is untimely. Rule 32.7(b) of the Alabama Rules of Criminal Procedure shall not apply to any amendments to a petition for post-conviction relief filed pursuant to this section after the filing date that is applicable to the defendant under this section. Any amendments to a petition for post-conviction relief filed pursuant to this section filed after the filing date that is applicable to the defendant under this section shall be treated as a successive petition under Rule 32.2(b) of the Alabama Rules of Criminal Procedure.

"(i) The circuit court shall not entertain a petition in a case in which the death penalty has been imposed based on the grounds specified in Rule 32.1(e) of the Alabama Rules of Criminal Procedure unless the petition for post-conviction relief is filed within the time period specified in subsection (c) or (d), or within six months after the discovery of the newly discovered material facts, whichever is later.

"(j) This section shall apply to any defendant who is sentenced to death after August 1, 2017."

§ 13A-5-53.1.

The FJA clearly prohibits circuit courts from entertaining a petition, "unless the petition, <u>including any amendments</u> to the petition, is filed within 365 days of the filing of the appellant defendant's first brief on direct appeal." § 13A-5-53.1(c) (emphasis added).  There are limited exceptions to this prohibition.  For example, circuit courts are permitted to grant "<u>one</u> 90-day extension," but only "for <u>good cause</u> shown and after notice and an opportunity to be heard from the [State]." § 13A-5-53.1(d) (emphasis added).  The FJA thus forecloses any application of equitable tolling to a filing deadline for a <u>petition</u> because it expressly establishes the limited circumstances in which a circuit court may, in its discretion, find good cause for the untimely filing of a <u>petition</u> and establish a new deadline and, in some cases, appoint new counsel.  (Notably, even when new counsel is appointed, the petition is to be filed "not more than 270 days after the date the circuit court appoints new counsel." § 13A-5-53.1(f)(3).)  The FJA further expressly includes <u>amendments</u> in its 365-day filing deadline for petitions and expressly excludes any application of Rule 32.7(b) (which permits amendments in non-death-penalty postconviction proceedings "at any stage of the proceedings prior to the entry of judgment") to amendments in death-penalty postconviction

34

proceedings, stating: "Rule 32.7(b) of the Alabama Rules of Criminal Procedure shall <u>not</u> apply to any <u>amendments</u> to a petition for postconviction relief filed ... <u>after</u> the filing date." § 13A-5-53.1(h) (emphasis added). Instead, under the FJA, "[a]ny <u>amendments</u> to a petition for post-conviction relief filed pursuant to this section filed after the filing date ... <u>shall be treated as a successive petition under Rule 32.2(b)</u> of the Alabama Rules of Criminal Procedure." § 13A-5-53.1(h) (emphasis added).

> Rule 32.2(b), Ala. R. Crim. P., provides, in pertinent part:
>
> "The court shall not grant relief on a successive petition on the same or similar grounds on behalf of the same petitioner. A successive petition on different grounds shall be denied unless (1) the petitioner is entitled to relief on the ground that the court was without jurisdiction to render a judgment or to impose sentence or (2) the petitioner shows both that good cause exists why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and that failure to entertain the petition will result in a miscarriage of justice."

Before addressing Belcher's equitable-tolling arguments, we initially note that Belcher could have attempted to show the circuit court that his amendment satisfied the requirements for a successive petition under Rule 32.2(b). However, as the circuit court recognized, Belcher has

never attempted, including in his brief to this Court, to explain how his amendment satisfied the requirements of a successive petition. Thus, we need not consider those requirements because Belcher wholly relies on the doctrine of equitable tolling, as articulated in Ex parte Ward, 46 So. 3d 888, 896 (Ala. 2007). Belcher's reliance, however, is misplaced because the reasons for applying equitable tolling to extend a filing deadline in postconviction proceedings governed by Rule 32, Ala. R. Crim. P., do not apply in postconviction proceedings governed by the FJA.

In Ex parte Ward, the Alabama Supreme Court recognized that, although "the limitation provision of Rule 32.2(c) is an affirmative defense and not a jurisdictional bar," "it is nonetheless written in mandatory terms." 46 So. 3d at 896. The Alabama Supreme Court held that, because Rule 32.2(c) was not a jurisdictional bar, "equitable tolling is available in extraordinary circumstances that are beyond the petitioner's control and that are unavoidable even with the exercise of diligence." Id. at 897 (emphasis added). In so holding, the Alabama Supreme Court noted that federal courts have also held that equitable tolling was applicable, in "extraordinary circumstances," in federal habeas proceedings governed by 28 U.S.C. § 2244, "notwithstanding that

36

the word 'shall' appears." Id. at 896-97 (emphasis added). See, e.g., Sandvik v. United States, 177 F.3d 1269 (11th Cir. 1999). The Alabama Supreme Court emphasized that "the threshold necessary to trigger equitable tolling is very high, lest the exceptions swallow the rule." Id. at 897 (quoting United States v. Marcello, 212 F. 3d 1005, 1010 (7th Cir. 2000)).

Belcher fails to acknowledge that, under the FJA, Rule 32.2(c) does "not apply to cases in which a criminal defendant is convicted of capital murder and sentenced to death." § 13A-5-53.1(a) (emphasis added). The legislature has made clear that the filing deadline in postconviction proceedings governed under the FJA is not to be treated the same way that a filing deadline is to be treated under Rule 32.2(c). There is a stark difference between the FJA's mandatory provisions and the mandatory provisions in Rule 32 or § 2244. The FJA expressly provides for postconviction counsel to be appointed within 30 days of the imposition of a death sentence, which should minimize the occurrence of "extraordinary circumstances" that would prevent petitioners from meeting the filing deadline. Under federal law, in capital cases, including habeas proceedings, "any defendant [who is sentenced to death] who is or

37

becomes financially unable to obtain adequate representation … shall be entitled to the appointment of [counsel]." 18 U.S.C. § 3599.  However, § 3599 provides no mandatory time frame for this appointment, as the FJA does.  Moreover, under Rule 32.7(c), Ala. R. Crim. P., the appointment of counsel is "discretionary."  See, e.g., Deas v. State, 844 So. 2d 1286, 1288 (Ala. Crim. App. 2002). Second, unlike Rule 32 or § 2244, which do not provide for any extensions, the FJA anticipates "extraordinary circumstances" and expressly permits one 90-day extension for "good cause shown and after notice and an opportunity to be heard from the Attorney General." § 13A-5-53.1(d) (emphasis added).  Third, unlike Rule 32 or § 2244, the FJA itself provides that a defendant who files an untimely petition may "show good cause demonstrating extraordinary circumstances as to why the petition was not properly filed" and provides courts with discretion, upon a finding of "good cause," to grant another 30-day extension or even appoint new counsel and allow the petitioner up to 270 additional days after that appointment for the filing of a petition.  § 13A-5-53.1(f).  Thus, equitable tolling has no application to postconviction proceedings filed under the FJA because the FJA has already recognized that "extraordinary circumstances" could arise and

has established remedies for those circumstances, including extensions of the filing deadline. Accordingly, we hold that the FJA's provisions allowing for the extension of its filing deadline for "good cause demonstrating extraordinary circumstances" render equitable tolling both unnecessary and inapplicable to postconviction proceedings under the FJA.

Separation-of-powers principles also support our holding that equitable tolling does not apply to the FJA's filing deadline. Unlike Rule 32, which was promulgated by the Alabama Supreme Court, the FJA is a <u>statute</u> promulgated by the <u>legislature</u>. The FJA's provisions already provide courts the discretion to consider "extraordinary circumstances" and provide specific remedies, including extensions of the filing deadline, upon a finding of "good cause demonstrating the extraordinary circumstances." It is not within the province of the judiciary to disregard those express provisions -- unless those provisions are themselves unconstitutional.[8] <u>See, e.g.</u>, <u>Ex parte Bailey</u>, [Ms. CR-2024-0635, May 2, 2025] ___ So. 3d ___, ___ (Ala. Crim. App. 2025) ("[T]his Court will not

---

[8]The constitutionality of the FJA is addressed in Part VI of this opinion.

substitute itself for the Legislature and judicially impose a remedy for noncompliance when the Legislature has failed to speak unless noncompliance offends minimum standards of due process.").

In sum, application of the judicially created doctrine of equitable tolling, which is applicable in postconviction proceedings governed by Rule 32, is not applicable in postconviction proceedings governed by the FJA. The FJA specifically recognizes the need for equitable exceptions, provides the standards governing those exceptions, and provides specific remedies when there is "good cause demonstrating extraordinary circumstances."

Equitable tolling is also inapplicable to the treatment of amendments under the FJA. In the criminal context, "[t]he doctrine of equitable tolling is an exception only to the limitations provision of Rule 32.2(c), Ala. R. Crim. P." State v. Baker, 172 So. 3d 860, 866 (Ala. Crim. App. 2015) (emphasis added). We thus held in Baker that the doctrine of equitable tolling "does not provide a basis for overcoming the bar against successive claims under Rule 32.2(b), Ala. R. Crim. P." Id. (emphasis added). We noted that "neither the Alabama Rules of Criminal Procedure, nor the decisions of this Court, nor the decisions of the

40

Alabama Supreme Court have carved out any 'equitable' exception to Rule 32.2(b) [governing successive petitions], Ala. R. Crim. P." Id. This Court then rejected Baker's contention that, because the Rule 32.2 grounds for preclusion had been held to be mandatory and "not jurisdictional," see Ex parte Clemons, 55 So. 3d 348 (Ala. 2007), circuit courts should have the power to apply equitable tolling to the Rule 32.2(b) grounds of preclusion. We explained that the phrase "'not jurisdictional' ... does not mean ... that the circuit court may choose to disregard a ground of preclusion that has been properly asserted by the State and has not been subsequently disproved by the petitioner by a preponderance of the evidence." Baker, 172 So. 3d at 866. Rather, we explained that, although "the State's failure to properly raise a ground of preclusion constitutes a waiver of that affirmative defense," "Clemons did not hold that a properly asserted ground of preclusion, which is not subsequently disproved, could be simply disregarded by a circuit court if it so chose." Id. at 866-67. "[I]f a ground of preclusion has been properly asserted and has not been waived by the State, a circuit court cannot simply choose to disregard that ground." Id. at 867.

Here, the FJA requires that Belcher's amendment be treated as a <u>successive petition</u> under the FJA, and the State pleaded that Belcher had not met the requirements of a <u>successive petition</u>. As we held in <u>Baker</u>, "equitable tolling" does <u>not</u> provide a basis for overcoming the bar against <u>successive</u> claims.[9]

Finally, it is also noteworthy that, even if equitable tolling were applicable to either the filing deadline or the treatment of amendments under the FJA, Belcher never set forth sufficient facts that would qualify him for equitable tolling. Belcher generally contends that the COVID-19 pandemic impeded his ability to investigate and present his postconviction claims, but he never set forth any specific allegations regarding why he was unable to discover the facts contained in his amendment before or during the COVID-19 restrictions. Even in his brief on appeal, the closest Belcher comes to making any specific allegation regarding how he was impeded from getting information is his general

---

[9]Contrary to Belcher's assertion in his reply brief that the State never pleaded that the amendment was precluded as a successive petition (Belcher's reply brief, p. 12), on September 22, 2021, the State moved to strike Belcher's amendment on the ground that it must meet the requirements of a successive petition and that "Belcher has made absolutely no [such] showing." (C. 535-38). Thus, the State did not "waive" this ground of preclusion.

contention that, "for over a year leading up to [his] deadline, conducting the extended, in-person interviews necessary to investigate post-conviction claims was not considered safe by public health officials." (Belcher's brief, p. 20.) It is entirely unknown why Belcher could not have discovered the claim made in his amendment in time to present it in his petition, for which he had already received his one 90-day extension under the FJA. Stated differently, "[n]othing before us indicates that [he] could not have obtained the [information] over the telephone or wearing masks and employing social distancing." Ex parte Miller, 335 So. 3d 1151, 1155 (Ala. 2021) (holding, in a civil case, that "there is nothing suggesting that any administrative order of this Court operated to suspend the jurisdictional deadline applicable to a ruling on Mitchell's postjudgment motion .... Instead, our [COVID-19] orders explained that they were not intended to affect established 'jurisdictional limitations provided for by statute or rule'"). In short, Belcher failed to plead any facts that would entitle him to equitable tolling, even if equitable tolling were applicable in postconviction proceedings governed by the FJA, which we have held it is not.

For all these reasons, Belcher is not entitled to relief on this claim.

43

### III. Penalty-Phase Ineffective-Assistance Claims

Belcher also contends that the circuit court erroneously dismissed his multiple penalty-phase ineffective-assistance-of-counsel claims without a hearing.

In considering Belcher's ineffective-assistance-of-counsel claims, we apply the following well-settled legal principles:

> "'To prevail on a claim of ineffective assistance of counsel, the petitioner must show (1) that counsel's performance was deficient and (2) that the petitioner was prejudiced by the deficient performance. See Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).
>
> > "'"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must

44

indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."

"'Strickland, 466 U.S. at 689.

"'"[T]he purpose of ineffectiveness review is not to grade counsel's performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S. Ct. [2052] at 2065 [(1984)]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir. 1992) ('We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.'). We recognize that '[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.' Strickland, [466 U.S. at 693,] 104 S. Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done

> something more or something
> different. So, omissions are inevitable.
> ..."
>
> "'Chandler v. United States, 218 F.3d 1305, 1313-
> 14 (11th Cir. 2000) (footnotes omitted).
>
> "'An appellant is not entitled to "perfect
> representation." Denton v. State, 945 S.W.2d 793,
> 796 (Tenn. Crim. App. 1996). "[I]n considering
> claims of ineffective assistance of counsel, 'we
> address not what is prudent or appropriate, but
> only what is constitutionally compelled.'" Burger
> v. Kemp, 483 U.S. 776, 794, 107 S.Ct. 3114, 97
> L.Ed.2d 638 (1987).'

> "Yeomans v. State, 195 So. 3d 1018, 1025-26 (Ala. Crim. App.
> 2013). ...
>
> "We also recognize that when reviewing claims of
> ineffective assistance of counsel 'the performance and
> prejudice components of the ineffectiveness inquiry are mixed
> questions of law and fact.' Strickland v. Washington, 466 U.S.
> 668, 698, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)."

Marshall v. State, 182 So. 3d 573, 582-83 (Ala. Crim. App. 2014).

In determining whether a petitioner was prejudiced by any deficient performance,

> "'"a defendant must show that there is a reasonable
> probability that, but for counsel's unprofessional errors, the
> result of the proceeding would have been different. A
> reasonable probability is a probability sufficient to undermine
> confidence in the outcome." ... In assessing prejudice, we
> reweigh the evidence in aggravation against the totality of
> available mitigating evidence.'"

46

Gaddy v. State, 952 So. 2d 1149, 1171 (Ala. Crim. App. 2006) (quoting

Wiggins v. Smith, 539 U.S. 510, 534 (2003), quoting in turn Strickland v.

Washington, 466 U.S. 668, 694 (1984)).

In reviewing Belcher's ineffective-assistance claims, we again note that the same judge who presided over Belcher's capital-murder trial and sentencing hearing (and who, ultimately, sentenced Belcher to death after independently weighing the aggravating and mitigating circumstances following the jury's unanimous recommendation of the death penalty) also ruled on Belcher's postconviction petition. The circuit court, thus, considered Belcher's claims in light of its own personal observations when it dismissed Belcher's myriad ineffective-assistance claims because they were either meritless, insufficiently pleaded, or both.

With these considerations in mind, we review Belcher's claim that the circuit court erroneously summarily dismissed each of the following individual penalty-phase ineffective-assistance claims that were made by Belcher in his postconviction petition and are further argued on appeal. As explained below, we hold that the circuit court properly summarily dismissed Belcher's penalty-phase ineffective-assistance-of-counsel claims.

47

### A. Counsel's Mitigation Investigation

Belcher first generally contends, as he did in his petition, that his trial counsel failed to adequately investigate and present mitigation evidence. In support of this claim, Belcher contends that counsel "conducted in-person interviews with only three family members" -- his mother, his father, and his ex-wife. (Belcher's brief, p. 30.) Belcher further contends that his sister was "interviewed only once by phone" and that counsel failed to "collect basic records ... court records, school records, medical records, military records, drug-treatment records, police records, and jail records," which, he says, left counsel "unaware of important mitigating facts." (Belcher's brief, p. 30.)

We initially question whether Belcher's contentions in his petition and his brief on appeal, and his generalized assertion that the circuit court improperly dismissed this claim based on "strategy" when, he says, counsel's failure to investigate rendered counsel unable to make a "strategic decision," and his citing cases discussing the obligation to conduct a mitigation investigation, with no explanation as to their holdings or applicability here, is sufficient to comply with Rule 28(a)(10), Ala. R. App. P. See e.g., McWhorter v. State, 142 So. 3d 1195, 1237 (Ala.

48

Crim. App. 2011). Nonetheless, even if Belcher's argument satisfied the specificity requirements of Rule 28(a)(10), based on the record and the circuit court's findings in its order, Belcher's "argument is inconsistent with the defense theory of the case or [the facts and theories that he contends should have been presented] would have been otherwise cumulative." Id. at 1237.

In considering Belcher's myriad penalty-phase claims regarding mitigation evidence, we recognize that "[c]ounsel's obligation is to conduct a 'substantial investigation into each of the plausible lines of defense.'" Jones v. State, 753 So. 2d 1174, 1191 (Ala. Crim. App. 1999) (quoting Strickland, 466 U.S. at 681). "'A substantial investigation is just what the term implies; it does not demand that counsel discover every shred of evidence but that a reasonable inquiry into all plausible defenses be made.'" Id. (quoting Strickland, 466 U.S. at 686). Moreover,

> "'[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.'"

Id. (quoting, Strickland, 466 U.S. at 691).

49

Likewise, a distinction must be made "'"'between counsel's complete failure to conduct a mitigation investigation, where we are likely to find deficient performance, and counsel's failure to conduct an adequate investigation where the presumption of reasonable performance is more difficult to overcome.'"'" Marshall v. State, 182 So. 3d 573, 595 (Ala. Crim. App. 2014) (quoting McWhorter v. State, 142 So. 3d 1195, 1245 (Ala. Crim. App. 2011), quoting in turn Ray v. State, 80 So. 3d 965, 984 (Ala. Crim. App. 2011), quoting in turn Beuke v. Houk, 537 F.3d 618, 643 (6th Cir. 2008)). "'"'A lawyer can almost always do something more in every case. But the Constitution requires a good deal less than maximum performance.'"'" Id. at 596 (citations omitted). And, counsel's investigation "'"'must not be evaluated with the benefit of hindsight but accorded a strong presumption of reasonableness.'"'" Id. (citations omitted). We also note that "'"'[c]ounsel is not required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy. Counsel must be permitted to weed out some arguments to stress others and advocate effectively.'"'" McWhorter, 142 So. 3d at 1246 (citations omitted).

Finally,

50

"'[w]hether trial counsel were ineffective for not adequately investigating and presenting mitigating evidence "'turns upon various factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the mitigation evidence that could have been presented.'" McMillan v. State, 258 So. 3d 1154, 1168 (Ala. Crim. App. 2017) (quoting Commonwealth v. Simpson, 620 Pa. 60, 100, 66 A.3d 253, 277 (2013)).'

"Woodward v. State, 276 So. 3d 713, 773-74 (Ala. Crim. App. 2018)."

State v. Mack, [Ms. CR-2023-0284, Dec. 20, 2024] ___ So. 3d ___, ___ (Ala. Crim. App. 2024). Thus, "when evaluating any case of ineffective assistance of counsel related to the penalty phase of a capital-murder trial, we must consider what counsel did, in fact, present in the way of mitigation." Mack, ___ So. 3d at ___. "'"Although petitioner's claim is that his trial counsel should have done something more, we first look at what the lawyer did in fact."'" Id. at ___ (quoting Ray, 80 So. 3d at 979, quoting in turn Chandler v. United States, 218 F.3d 1305, 1320 (11th Cir. 2000)).

In its sentencing order, the trial court (we again note that the circuit-court judge who ruled on Belcher's postconviction petition was also the trial-court judge) noted that, on March 14, 2019, the jury

51

unanimously found Belcher guilty of capital murder during a kidnapping. (TC. 150.) The penalty phase began the next day before the same jury, and "[t]he State moved that all evidence presented in the guilt phase be considered by the jury in the penalty phase, which was granted." (TC. 150-51.) The trial court's sentencing order then summarized the evidence presented at the penalty phase, in pertinent part, as follows.

"The State presented evidence of two aggravating circumstances: 1) that the capital offense was committed while the Defendant was engaged in a Kidnapping in the First Degree; and (2) that the capital offense was especially heinous, atrocious, or cruel compared to other capital cases. The State presented testimony from the victim's mother, Suzanne Payne, and from West Alabama Violent Crimes Unit Inv. Richard Wilkins. ...

"[Belcher] presented evidence in mitigation from the following witnesses: Tuscaloosa County Sheriff's Deputy Mike Byars, R. Randall Griffith, Vicky Belcher, Brad Belcher, Brandy Belcher, Debby Hicks, and Carol Belcher. ...

"The Court provided the jury with two verdict forms. The first being a 'Special Verdict Form' in order to determine whether the State had unanimously satisfied the jury beyond a reasonable doubt that the instant case was a capital offense that was especially heinous, atrocious and cruel compared to other capital offenses. A second verdict form was given, a general verdict form, in order to determine whether the jury would render an advisory verdict of death or life imprisonment without the possibility of parole; including the numbers of jurors so voting for those options.

"After due deliberations, the jury returned a verdict that they were unanimously satisfied beyond a reasonable doubt that the capital offense ... was especially heinous, atrocious and cruel compared to other capital offenses. Moreover, the jury returned an advisory verdict recommending to the Court that the penalty in [Belcher's] case should be death. Twelve jurors voted in favor of death. None voted in favor of life imprisonment without the possibility of parole. The jury was polled as to the aggravating circumstance of heinous, atrocious and cruel, and the verdict was unanimous. The jury was further polled as to the 12-0 advisory verdict of death ....

"During the penalty phase of the trial, the State offered all evidence admitted in the guilt phase. ... The motion was granted. In doing so, the State presented evidence of one aggravating circumstance -- under § 13A-5-49(4), [Ala. Code 1975,] a capital offense was committed while the defendant was engaged in a kidnapping.

"Th[e State] also presented evidence from Inv. Richard Wilkins, who had testified during the guilt phase. Inv. Wilkins testified that he had been an investigator in [the] Violent Crimes Unit since 2012. He testified that no other case in his experience and memory demonstrated the level of violence, cruelty and torture as found in this case. In doing so, the State presented evidence of a second aggravating circumstance -- under § 13A-5-49(8), the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses.

"The State also offered additional testimony from Suzanne Payne, the victim's mother.

"The Defendant offered the following testimony in mitigation:

"Tuscaloosa County Sheriff's Deputy Mike Byars: Deputy Byars testified regarding his interactions with

53

[Belcher] during [Belcher's] incarceration. The deputy recalled one outburst of anger from [Belcher], for which he soon apologized. He testified [Belcher] was a well-behaved inmate.

"Dr. Randall Griffith: Dr. Griffith testified he diagnosed [Belcher] with Mild Neuro-Cognitive Disorder. This disorder can affect thinking ability and memory. The disorder can cause a person to be impulsive and paranoid. Dr. Griffith believes this disorder arose in [Belcher] because of multiple head injuries he sustained while racing motorcycles. Dr. Griffith conceded that [Belcher's] cognitive problems could also be caused by drug use.

"....

"Brad Belcher: [Belcher's] father testified about the close relationship he had with his son in early years. [Belcher] learned to ride and race motorcycles at an early age. He testified that, as an adult, [Belcher] changed dramatically after getting married and having a daughter. He became a doting father. However, after [Belcher] divorced and lost primary custody of his child, it became the darkest time in [Belcher's] life. Belcher testified that he did not know the extent of his son's drug problems until these events occurred.

"Brandy Belcher: [Belcher's] younger sister testified that her brother is kind and loving. He loves animals. He is a very talented mechanic.

"Debby Hicks: Hicks is [Belcher's] aunt. She testified [Belcher] was always kind and protective of her daughter; his younger cousin. She also testified that he was a doting father with his own child.

"Carol Belcher: [Belcher's] mother testified she had seen a change in him since he had been [in] jail. His Christian faith had grown. She said they pray together on the phone.

54

"All family members testified of their desire to maintain a strong relationship with [Belcher] should he be sentenced to life in prison."

(C. 33-34, 43-45.)

The trial court stated its findings from the sentencing hearing, in pertinent part, as follows.

"The Court reviewed the sentencing memorandum filed April 1st on behalf of the Defendant. The pre-sentence report prepared by the probation office was admitted as a Court exhibit in these proceedings. The Court having been the trial court and having heard all testimony in this matter adopts all evidence previously presented in the guilt phase and the penalty phase, both proceedings being held before the Court and the evidence being presented before the jury in both hearings is incorporated in this hearing and is to be considered by the Court in affixing punishment.

"The State called no witnesses. The Defendant called no witnesses but offered the sentencing memorandum as an exhibit in these proceedings. No further argument was made by either the State or the Defendant. When the Court asked the Defendant if he had anything to say before sentence was pronounced, he made a brief statement, professing his Christian faith and apologizing for the events leading to the victim's death.

"All the above was considered by the Court in making the following findings regarding aggravating and mitigating circumstances."

(TR. 163-64.)

The trial court found that the aggravating circumstance that the murder was committed during a kidnapping, under § 13A-5-49(4), Ala. Code 1975, applied, "as unanimously determined by the jury during the guilt phase," and that the aggravating circumstance that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses applied, "as unanimously determined by the jury during the penalty phase." (C. 47.) The trial court then found, in pertinent part, the following statutory mitigating circumstances:

"Mitigating circumstance number one, under § 13A-5-51(1), [Ala. Code 1975,] the defendant has no significant history of prior criminal activity, does apply and was given its due weight.

"Mitigating circumstance number two, under § 13A-5-51(2), the capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance, does not apply. The Court has considered the opinion that the Defendant suffers from Mild Neuro-Cognitive Disorder. However, the Court is not convinced from the evidence that any such disorder rises to the level of being an extreme mental or emotional disturbance such that it is a statutory mitigating circumstance. Accordingly, the Court finds that the Defendant's diagnosis of Mild Neuro-Cognitive Disorder is a non-statutory mitigating circumstance.

"....

"Mitigating circumstance number five, under § 13A-5-51(5), the defendant acted under extreme duress or under the substantial domination of another person, does not apply.

56

"Mitigating circumstance number six, under § 13A-5-51(6), the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, does not apply. As stated, the Court has considered the opinion that the Defendant suffers from Mild Neuro-Cognitive Disorder. However, the Court is not convinced from the evidence that any such disorder rises to the level of substantially diminishing the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, such that it is a statutory mitigating circumstance. The Court finds that the Defendant's drug usage is, instead, a non-statutory mitigating circumstance.

"Mitigating circumstance number seven, under § 13A-5-51(7), the age of the defendant at the time of the crime, does not apply. The Defendant was thirty (30) years old at the time of the crime."

(C. 48-49.)

The trial court found the following nonstatutory mitigating circumstances:

"Non-statutory mitigating facts under § 13A-5-52[, Ala. Code 1975,] can be wide-ranging and 'shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers.' The Court has considered each non-statutory mitigator offered by Defendant to the extent it is supported by evidence. Those non-statutory mitigating circumstances found to be present, and considered by this Court include:

57

"The Defendant's desire to maintain a strong relationship with his daughter and his family, and desire of his daughter and family to maintain a strong relationship with him;

"The Defendant's good behavior as an inmate;

"The Defendant's ability to be a productive prisoner in teaching mechanic skills to other prisoners and in leading Bible studies;

"The Defendant's Mild Neuro-Cognitive Disorder;

"The Defendant's drug usage;

"The sentences of co-Defendants pursuant to plea agreements, particularly the split sentence of co-Defendant Bruce;

"The pleas of mercy on the Defendant's behalf, made by his attorneys and family members. While it is impossible to quantify a plea for mercy, this Court finds that Defendant sufficiently raised the issue, and thus this Court has given Defendant's plea for mercy consideration.

"No other non-statutory mitigating circumstances exist. The Court specifically finds that the non-statutory mitigating circumstance of remorse does not exist in this case."

(C. 50-51.)

The trial court concluded:

"After consideration of all the matters presented to the Court, the testimony heard during the guilty phase and penalty phase of trial, both in mitigation and aggravation, the pre-sentence investigation report and the recommendation of the jury contained in its advisory verdict, and after taking into

consideration all of the other matters that were proffered to this Court, disregarding any references to passion, or prejudice or emotion, the Court does now find and is convinced beyond a reasonable doubt that in this case the aggravating circumstances outweigh the mitigating circumstances, and the Court does concur with the jury's recommendation and does hereby affix Michael David Belcher's punishment at death, by lethal injection."

(TC. 169.)

Belcher's postconviction petition asserted that two witnesses would have indicated that Belcher was remorseful for Samantha's death. It is noteworthy that the trial court's sentencing order expressly found that the nonstatutory mitigating circumstance of remorse did not exist in Belcher's case. Even a cold reading of Belcher's testimony supports the finding that Belcher was devoid of remorse. See, e.g., (TR. 965 (Belcher told the others, "Don't kill her here [in his father's shop]")); (TR. 968 (He had "no idea what they was doing" and "they" were doing everything; he was just "watching")); (TR. 969-75 (Belcher acknowledged helping "them" put Samantha in his car and transporting her to Alyssa's father's house, putting her in the trunk of his car, stopping so they could put her back when she somehow escaped the moving car, and eventually helping Steven George place her in the woods, but he continually says that "they" were hitting, kicking, pulling, stabbing, and jabbing her, and that he "just

59

went along")); and (TR. 990 (Belcher told the jury, "I just followed the crowd")). Lack of remorse is appropriately considered when it undermines mitigation evidence. See, e.g., White v. State, 179 So. 3d 170, 233 (Ala. Crim. App. 2013) ("White's lack of remorse tended to undermine mitigation evidence indicating that White suffered from impulse control problems that may have contributed to Jasmine's murder."), and Hosch v. State, 155 So. 3d 1048, 1096 (Ala. Crim. App. 2013) (rejecting Hosch's claim that the trial court erroneously considered his lack of remorse, based on "Hosch display[ing] little emotion at trial and express[ing] no remorse," in its weighing of the nonstatutory mitigating circumstances). Belcher did not testify at his penalty-phase hearing, but he spoke before his sentence was pronounced, saying only that he loved Jesus and that he was "sorry for the events that transpired on the 2nd of November 2015 for every participant and the families." (TR. 1211 (emphasis added).) Notably, Belcher did not express guilt or ask forgiveness for his own role in Samantha's murder, and he did not express specific sorrow for what Samantha and her family suffered. Thus, in considering whether trial counsel were ineffective for failing to present the mitigation evidence pleaded in Belcher's petition, we note that the trial court's finding that

60

Belcher was not remorseful is another factor in assessing whether there is a reasonable probability that the pleaded mitigation evidence, if presented and true, would have resulted in a different sentence, particularly where, as here, the trial judge was also the circuit judge who ruled on the postconviction petition.

Before considering Belcher's individual claims, we also note that the record shows that Belcher's counsel employed a mitigation expert, Dr. Griffith, to assist with the penalty phase. Moreover, the circuit court, in its order summarily dismissing Belcher's petition, found that trial counsel's mitigation investigation, strategy, and presentation of evidence were reasonable.

> "[I]t is clear upon the face of the record and from what the Court observed at trial that trial counsel chose a strategy of emphasizing Belcher's positive qualities in a reasonable attempt to show Belcher was a good, decent person who made a mistake but who could still adapt and contribute to society with a sentence of life without parole."

(C. 789.)

The circuit court further explained in its order:

> "Counsel put on evidence that Belcher is a good person (R. 1150-52, 1154-55), whose poor choices were informed by his mild neurocognitive disorder which impacts his thinking and memory capabilities (R. 1109-10); he has no significant criminal history (R. 1099); he has served in the military (C.

61

380-81; R. 1142-43); he is close with his family (R. 1142, 1147-48, 1150, 1152, 1154-55, 1162, 1164-70); he has a daughter whom he loves and who loves him (R. 1139, 1140, 1144, 1148, 1151, 1155-56, 1163); he is a responsible father (R. 1143-44, 1151, 1155); and importantly, he can adjust well to prison life.[10] (R. 1101-02, 110, 1115, 1117, 1138, 1169.)"

(C. 789.) Thus, trial counsel's strategy was not that Belcher was a person whose sad circumstances had caused his actions and justified life imprisonment without parole but, rather, was arguably the more persuasive strategy that Belcher had truly changed since going to jail and becoming sober, committing to Christ, participating in Bible studies, and teaching other prisoners. In short, counsel attempted to show, and expressly argued, that Belcher was, at the time of the trial, "a person whose life is worth saving." (TR. 1099.) Moreover, counsel attempted to show that Belcher's life should be spared by presenting the testimony of six witnesses, including family and friends, a jail guard, and Dr. Griffith (the neuropsychologist); presenting letters from family and friends, a slideshow made by Belcher's mother, and a picture of Belcher's daughter;

---

[10]More specifically, evidence was presented during the penalty phase that Belcher could be productive and helpful to other inmates, both spiritually, by leading and teaching Bible studies, and vocationally, by teaching mechanic skills.

and by preparing a sentencing memorandum. (TC. 396-402, 408-11; TR. 1095-1185.)

The circuit court did not abuse its discretion by finding that this general claim, which is really nothing more than an attempt to fault trial counsel for not pursuing a more exhaustive theory of mitigation, was without merit. See, e.g., Bush v. State, 92 So. 3d 121, 160 (Ala. Crim. App. 2009) ("'The fact that this defense strategy was ultimately unsuccessful with the jury does not render counsel's performance deficient.'" (quoting Heath v. State, 3 So. 3d 1017, 1029 (Fla. 2009))). In sum, the circuit court properly found that "defense counsel's strategy in mitigation was reasonable and that additional evidence presented at the postconviction hearing would have been cumulative to evidence presented by trial counsel or would have been inconsistent with evidence presented to support trial counsel's reasonable strategy." McWhorter, 142 So. 3d at 1237.

Moreover, to the extent that Belcher also baldly contends on appeal that the circuit court erred by failing to evaluate the cumulative effect of counsel's alleged deficiencies, this claim is waived under Rule 28(a)(10). It is also without merit because Alabama appellate courts do not apply a

"'cumulative-effect analysis to claims of ineffective assistance of counsel.'" Musgrove v. State, 144 So. 3d 410, 452 (Ala. Crim. App. 2012) (quoting Brooks v. State, 929 So. 2d 491, 514 (Ala. Crim. App. 2005)). Regardless, as explained below, Belcher "fails to demonstrate that a series of individual allegations of deficient performance -- although found not to be deficient in themselves -- could nevertheless be deficient when considered collectively." McWhorter, 142 So. 3d at 1235.

## B.    Brain Injuries

Belcher argues that the circuit court erroneously dismissed his claim that trial counsel should have investigated and presented myriad evidence to show that he suffered repeated traumatic brain injuries ("TBI") as a motorcycle racer that caused "lasting brain damage" and may have caused him to develop chronic traumatic encephalopathy ("CTE"). (Belcher's brief, p. 32.)

In his petition, Belcher pleaded the names of multiple friends and family members who could have testified regarding the risky nature of motorcycle racing; "a number of specific serious wrecks" Belcher had; and the belief that, because of those accidents, he had headaches, was impulsive, engaged in risky behavior, and had "impaired executive

64

functioning," such as having trouble paying bills. (C. 136-37, 138-42.) Belcher further pleaded that counsel should have obtained medical records showing his emergency-room treatment in Mississippi following a motorcycle accident when he was 16 years old and treatment at Druid City Hills Regional Medical Center, specifically after a wreck in 2000 that dislocated his shoulder and required surgery, and as proof of his ankle surgery that was necessitated by a motorcycle wreck in 2011. (C. 137.) In addition, Belcher alleged that counsel should have obtained and presented school records from Cahawba Christian Academy indicating that "Belcher's grades began to drop in 7th grade," that he "failed and repeated the 9th grade," and that he was "expelled" in the 10th grade. (C. 137.) Belcher also alleged that counsel failed to collect and present military records, which would have shown that he was "diagnosed with generalized anxiety disorder," which, he further contends, is a common side effect of TBI.

Finally, Belcher alleged that counsel were ineffective because they provided "inadequate and inaccurate information" to experts and provided an inadequate amount of time for evaluations. (C. 142.) Specifically, although Belcher's competency to stand trial and his mental

state at the time of the offense were evaluated by psychologist Dr. Kathy Ronan, the results of the evaluation were not complete until "two days before" trial.[11] (C. 143.) Likewise, neuropsychologist Dr. Griffith did not provide his report until March 11, 2019, shortly after Belcher's trial had begun. According to Belcher, with more time and accurate records (specifically noting that Dr. Griffith incorrectly believed that Belcher's father thought he had exaggerated his motorcycle accidents/injuries), Dr. Griffith could have attributed Belcher's cognitive deficits to his TBI "instead [of] simply ... [as] the result of [his] voluntary drug use." (TC. 144.) Belcher also contended that another expert, Dr. Erin Bigler, would have testified that TBI often causes CTE, addictions, mood instability, and aggression and that neuroimaging (MRI and PET scans) would have documented Belcher's brain damage in "a concrete and visible way." (C. 145-48.) Belcher then contended that, but for these instances of deficient performance, "there is a reasonable probability that [the jury] would not have recommended a death sentence, and [the trial court] would not have imposed it." (C. 149-50.)

---

[11]Notably, Belcher withdrew his plea of not guilty by reason of insanity after Dr. Ronan's evaluation. (TC. 149-50; TR. 95.)

The circuit court, however, did not abuse its discretion in finding these claims to be insufficiently pleaded and without merit. Contrary to Belcher's contentions, trial counsel investigated and presented evidence of his suffering from TBI. Dr. Griffith, an expert in neuropsychology, testified extensively about his evaluation of Belcher, and his extensive report was admitted into evidence. (TC. 369-87; TR. 1103-35.) Dr. Griffith testified to conducting a "fairly long interview" with Belcher, during which he also administered a personality and psychiatric inventory and a "paper and pencil test," as well as "reviewed some records that were provided to [him] from the defense." (TC. 369-87; TR. 1106-07, 1120.) Dr. Griffith, in fact, diagnosed Belcher with a "mild neurocognitive disorder," which he opined could have been caused by TBI from "numerous small head injuries" from repeated motorcycle accidents. (TC. 384-86; TR. 1109, 1111.) Dr. Griffth explained that Belcher had a "deficit" in his memory but that "the degree of his impairment in other areas of thinking is broadly within normal limits." (TR. 1109.) Dr. Griffith specifically testified that a person with a mild neurocognitive disorder, like Belcher, "can have problems in executive functioning." (TR. 1111.) Although Dr. Griffith also noted Belcher's substance-abuse

67

disorder, he specifically explained that a person with TBI was more prone to impulsive behavior and substance abuse because substance abuse is a method to "cope" with the "cognitive change" associated with TBI. (TR. 1112.) Dr. Griffith also noted that, at the time of the offense, Belcher was under "considerable stress." (TR. 1113.) Consistent with trial strategy, Dr. Griffith further testified that "recovery from methamphetamine is not as protracted in terms of brain disorders and brain disfunction" and that Belcher could recover and function normally and even live a "productive life in prison." (TR. 1115, 1117.) Refuting Belcher's postconviction claims that brain scans were needed at trial to "show" the jury his TBI, Dr. Griffith testified that, "[a]ctually, CT scans and MRI scans do not diagnose traumatic brain injury." (TR. 1122.) Dr. Griffith acknowledged on cross-examination that Belcher's TBI could have also been caused by drug use, which Belcher said began when he was 20 years old. Dr. Griffith was clear that, regardless of the cause, Belcher had a "mild neurocognitive disorder." (TR. 1134.) And, although Dr. Griffith apparently had inaccurate information that Belcher's father believed Belcher had "exaggerated the number and extent of his motorsport injuries," Dr. Griffith admitted at trial that he had not spoken to

Belcher's father or seen hospital records. (TR. 1124-25.) Moreover, Belcher's father testified that the report was incorrect and that he was, in fact, aware that his son had "been knocked out several times" in motorcycle crashes and, more specifically, that he had purchased his son four $700 helmets because of "concussions" and "severe crashes." (TR. 1147.) In addition, as the circuit court noted in its order dismissing this claim, there was considerable testimony about motorcycle racing, the intensity of the sport, as well as Belcher's crashes, concussions, and his being "knocked unconscious." (C. 792 (citing TR. 1111, 1138, 1142, 1147, 1150, 1167).) Yet, "Belcher's overall neurocognitive abilities fell within the average range for a person of his age and education." (C. 792 (quoting TC. 384).) As the circuit court properly found, "[t]he testimony that Belcher pleads … family members would have given is largely cumulative to the testimony other family members did in fact give." (C. 793.)

As for the timing of Dr. Griffith's report and whether something more could have been done, Dr. Griffith indicated that he had all the necessary information to provide a complete and accurate assessment of Belcher and, specifically, that brain scans were not necessary. (TR. 1122, 1135). Moreover, the record indicates that counsel was working with

experts well before the "eve of trial." (TC. 149 (trial counsel's motion for funds to hire expert assistance was granted in November 2018).); (TC. 48 (Belcher sought a continuance in January 2019 because "the experts required to assist the defendant ha[d] not completed their work").); (TC. 379 (Dr. Griffith spent three hours with Belcher on February 21, 2019).); and (TR. 1094 (the penalty phase began on March 18, 2019).)

Clearly, the trial court and the jury heard ample evidence regarding Belcher's neurocognitive deficits and that they were likely caused by TBI he incurred while racing motorcycles. Counsel's performance is not constitutionally deficient simply because they could have presented <u>additional</u>, <u>cumulative</u> evidence that Belcher had "mild neurocognitive impairment," that it was caused by TBI, specifically, by numerous head injuries from motorsports, or that, even if caused by his drug use, his drug use itself could be caused by the numerous head injuries. <u>See, e.g.</u>, <u>McWhorter</u>, 142 So. 3d at 1237 (noting that "additional evidence ... would have been cumulative to evidence presented by trial counsel or would have been inconsistent with evidence presented to support trial counsel's reasonable strategy"). Moreover, Belcher never "sufficiently pleaded how

the absence of [additional] information made a meaningful difference in his trial." (C. 795.)

In addition to being cumulative, many of Belcher's contentions, though specific, are also, as the circuit court found, speculative. "For example, Belcher pleads that [witnesses] would have testified that he was a good, talented racer, and ... that Belcher showed good sportsmanship. But Belcher does not explain how such testimony ... relate[s] to head injuries." (C. 796.) Being a good racer is not mitigation evidence, was cumulative to what his family testified to, and speculative. "Speculation is not sufficient to satisfy a [postconviction] petitioner's burden of pleading." (C. 794-96 (quoting Mashburn, 148 So. 3d at 1125).)

Belcher also failed to sufficiently plead how the medical records he cited are relevant to his "brain damage." Although Belcher pleaded two specific hospital records that should have been obtained and presented, he pleaded only that they would have confirmed motorcycle accidents and surgeries to repair his shoulder and ankle, not that those records would have shown head injuries.

Likewise, Belcher did not plead how school records allegedly showing his poor grades beginning in the 7th grade and his expulsion in

71

the 10th grade were caused by head injuries or how this information would have resulted in a different sentence. Some of the information is also cumulative in that "[t]he jury was informed that Belcher dropped out of school in the 10th grade and obtained his GED." (C. 798 (citing TC. 381).) In addition, the contentions regarding poor grades and bad behavior directly contradict that Belcher "denied having any difficulties in his academic pursuits and denied ever being held back," as well as denied "behavior problems while in school." (C. 798 (citing TC. 381).) Counsel had no grounds to seek school records based on Belcher's own statements. See, e.g., Walker v. State, 194 So. 3d 253, 282 (Ala. Crim. App. 2015) ("'The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.'" (quoting Strickland, 466 U.S. at 691)). Moreover, Belcher's expulsion would have been a double-edged sword. "'An ineffective-assistance claim does not arise from the failure to present mitigation evidence where that evidence presents a double-edged sword.'" Washington v. State, 95 So. 3d 26, 53 (Ala. Crim. App. 2012) (quoting Reed v. State, 875 So. 2d 415, 437 (Fla. 2004)).

Belcher's contentions that military records should have been obtained and presented to show his anxiety was also insufficiently pleaded and cumulative. As the circuit court noted, Belcher did not sufficiently plead how the records would have made a difference when "[trial] counsel did present unchallenged evidence of Belcher's generalized anxiety disorder [that was diagnosed in the military] to the jury via Dr. Griffith's report." (C. 799.) See, e.g., Peraita v. State, 386 So. 3d 799, 835 (Ala. Crim. App. 2021) (noting that "counsel is not ineffective for failing to present cumulative evidence").

Counsel is also not ineffective for failing to retain a different expert. Belcher contends, as he did in his petition, that Dr. Erin Bigler could have confirmed that Belcher suffered from TBI and better explained his TBI symptoms. However, Belcher was evaluated by two independent experts, Dr. Ronan and Dr. Griffith, before trial. Thus, this is not a situation where counsel failed to employ any experts. Moreover, "'"[d]efense counsel is entitled to rely on the evaluations conducted by qualified mental health experts, even if, in retrospect, those evaluations may not have been as complete as others may desire."'" White v. State, 343 So. 3d 1150, 1176 (Ala. Crim. App. 2019) (quoting McMillan v. State,

258 So. 3d 1154, 1177 (Ala. Crim. App. 2017), quoting in turn Darling v.

State, 966 So. 2d 366, 377 (Fla. 2007)). In addition, as already stated,

although Belcher contends that Dr. Bigler could have provided more

detailed or more conclusive testimony, the testimony would nonetheless

be largely cumulative of Dr. Griffith's testimony at trial -- that Belcher

suffered from a mild neurocognitive disorder caused by motorcycle

accidents and drug use, which are the same two causes Belcher contends

in his petition, albeit in more detail. Moreover, some of these details,

such as that "a subset of people with TBI experience issues with

aggression" and that "[r]epeated TBI would make this more likely and

aggression is frequently seen in cases of CTE," would have been a

"double-edged sword" and inconsistent with trial strategy, which was

clearly to show that Belcher was a different person now and able to help

others, not that he was predisposed to "aggression" because of TBI and

CTE. Evidence that is cumulative, inconsistent with trial strategy, or

potentially as harmful as helpful in mitigation does not establish

deficient performance. See, e.g., McWhorter, 142 So. 3d at 1237, 1249.

Moreover, some of the facts pleaded in the postconviction petition

directly contradict what Belcher told Dr. Griffith, and Belcher has

pleaded no facts to show why counsel should not have relied on Belcher's statements. For example, Belcher denied having problems with concentration and focus, and, although he said he had occasional migraine headaches, he denied having frequent, severe headaches, balance problems, vision issues, noise sensitivity, or light sensitivity. (TC. 380; C. 800.) See, e.g., Washington, 95 So. 3d at 52 (recognizing that "'[c]ounsel's actions are usually based, quite properly, on … information supplied by the defendant'" (quoting Strickland, 466 U.S. at 691)).

Belcher also contends that counsel should have shown that he had poor adaptive functioning; however, Belcher's working memory was in the average range, his "overall executive functioning was average," and he told Dr. Griffith that he was paying for his daughter to attend private school. (TC. 379, 384; C. 800-01.) As the circuit court recognized, "confirmation of a traumatic brain injury would not have changed the overall finding that Belcher's neurocognitive abilities fell within an average range." (C. 805 (citing TR. 1125-26).) Thus, the contentions that Belcher suffered from poor adaptive functioning were refuted by the record on direct appeal, and such claims are properly summarily

dismissed. See, e.g., Brooks v. State, 340 So. 3d 410, 454 (Ala. Crim. App. 2020 ("The circuit court properly summarily dismissed this claim because it was insufficiently pleaded and was clearly refuted by the record on direct appeal."). In addition, "'what investigation decisions are reasonable depends critically on'" the "'defendant's own statements or actions.'" Broadnax v. State, 130 So. 3d 1232, 1248 (Ala. Crim. App. 2013) (quoting Strickland, 466 U.S. at 691). And, Belcher has pleaded no facts to even suggest that no reasonable lawyer would have been satisfied with the evaluation and testimony of the expert counsel retained, particularly in light of the information that Belcher provided Dr. Griffith. Furthermore, according to Dr. Griffith, "the neurological imaging Belcher claims counsel should have sought to confirm a TBI 'do[es] not diagnose traumatic brain injury.'" (C. 807 (citing TR. 1122).) Moreover, the circuit court expressly considered Belcher's neurological disorder to be nonstatutory mitigating evidence. (TC. 168.)

Finally, the circuit-court judge (who also presided over Belcher's trial) was in the best position to determine the value of the additional factual allegations regarding cognitive defects and their cause. Considering the evidence presented during the penalty phase of Belcher's

capital-murder trial, we cannot say that the circuit court abused its discretion in rejecting this claim. There is nothing in Belcher's petition, particularly in light of the record, to suggest that, if this additional information had been presented, Belcher would not have been sentenced to death. Accordingly, the circuit court properly dismissed this claim because it was both insufficiently pleaded and without merit.

### C. Military Service

Belcher contends, as he did in his petition, that trial counsel failed to adequately investigate and present evidence regarding his military service, specifically that it would have been mitigating that he enlisted during a time when the United States was at war in Iraq and Afghanistan, that he had positive changes during that time, and that he suffered a "significant mental health crisis" during that time. (C. 150-51.) Belcher enlisted on September 29, 2005, and from "December 15, 2005, to February 1, 2006, Mr. Belcher's mental health was evaluated at least six times, and he was diagnosed with depression, anxiety, and adjustment disorders." (C. 151, 153.) Belcher was discharged from the military on March 10, 2006, nearly a decade before Samantha's murder.

As with other evidence that Belcher contends is mitigating, this evidence is cumulative, irrelevant, and presents a "double-edged sword." Belcher's father testified that the army was the "[b]est thing ever to happen to him" and that Belcher grew up "a whole lot" during that time. (TR. 1142.) Belcher's mother showed the jury pictures from Belcher's time in the military. And, Dr. Griffith noted in his report, which was submitted as evidence at trial, that "Belcher underwent psychiatric evaluation while in the U.S. Army and was treated for generalized anxiety disorder prior to his medical discharge" on this ground. (TC. 380-81.) See, e.g., Peraita, 386 So. 3d at 835 (noting that "counsel is not ineffective for failing to present cumulative evidence"). In addition, his mental-health problems in the army were far removed from the time of this crime, and any ongoing mental-health issue was refuted by Belcher, who "denied having any significant depression … panic disorder … frequent worry or nervousness, obsessions and/or compulsions, and social anxiety." (C. 380.) Even Belcher's petition notes that he "received an entry-level separation, which is a discharge given within the first 180 days for someone not adjusting well to military life," which does not indicate a mental-health issue in civilian life. (C. 151.) Moreover, rather

78

than reporting ongoing mental-health issues, Belcher told Dr. Griffith that he was "under considerable stress" around the time of the offense over work and breaking up with his girlfriend and that he had resumed using methamphetamine "3-4 weeks prior to his arrest" for the offense in question.  (TC. 386.)  "'The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.'"  Washington, 95 So. 3d at 52 (quoting Jones v. State, 753 So. 2d 1174, 1191 (Ala. Crim. App. 1999)).  In addition, testimony about his mental-health issues and resulting discharge from the army may have been a double-edged sword, and counsel is not ineffective for failing to present such evidence.  McWhorter, 142 So. 3d at 1249 (recognizing that counsel is not ineffective for failing to present evidence that could be both helpful and harmful to the defense).

In sum, the circuit court properly summarily dismissed this claim because Belcher did not plead how this additional information from his time in the military would have made a "meaningful difference" and, moreover, because it is meritless.  (C. 799.)

### D. Divorce and Custody Battle

Belcher contends that trial counsel failed to adequately investigate and present evidence regarding the divorce and custody battle he had with his ex-wife, specifically, that he was "an extremely devoted father" and that losing custody of his daughter and her suddenly moving caused him to "relapse into drug" use in the weeks before the offense.[12] (Belcher's brief, pp. 46-47.) This claim was also properly summarily dismissed because it was also insufficiently pleaded and meritless.

Again, the information Belcher contends should have been presented, although more detailed, is merely cumulative to the testimony presented, and "counsel cannot be ineffective for failing to present cumulative evidence." (C. 815.) See, e.g., Peraita, supra. As the circuit court noted, there was testimony about Belcher's marriage, about the birth of his daughter, that he was a protective and doting father who changed diapers and later sent his daughter to private school, that he had a lot of problems with custody after the divorce and "lost everything

---

[12]Notably, Belcher told Dr. Griffith that he had been under "considerable stress" at the time of the crime because of long work hours and because he "had broken up with his girlfriend, Britney Coley, about two months prior to the offense," not because of his ex-wife and custody problems. (TC. 386.)

… trying to get to see his daughter," that "this is what started [his] dark time," and that he continued to be an attentive, good father from prison. (TR. 1143-45, 1151-52, 1155, 1167.) As the circuit court also found, some of the facts that Belcher alleged should have come out, including that he was suspected of using drugs and cheating on his wife, would have been "contradictory to trial counsel's chosen penalty-phase strategy of trying to paint Belcher in a good light." (C. 816.) See, e.g., McWhorter, supra (counsel is not ineffective for failing to present evidence that could also be harmful). Likewise, divorce records that indicated that Belcher was unable to obtain custody because of his drug addiction, which worsened during the time of the offense, and that he was required to have supervised visits following an arrest on drug charges were both cumulative and potentially damaging.

As for the criminal records of his ex-wife's girlfriend, allegedly showing that she was violent toward him, Belcher fails to plead any facts to show that this would have been relevant, much less "mitigating." Belcher also never pleaded what specific Department of Human Resources ("DHR") records were relevant or what they would have shown other than his "stress" over custody disputes. Nor did Belcher plead how

phone records showing his distress over his daughter's move to another state, which was cumulative, would have made any difference in his sentence. In sum, Belcher did not plead how counsel's performance was deficient based upon counsel's failure to present this cumulative information.

For all these reasons, this claim was properly summarily dismissed for being insufficiently pleaded, and, in light of the evidence presented, it was without merit. Belcher pleaded no facts that would have made any difference in his sentencing outcome.

E.    Counsel's Investigation and Presentation of Addiction

Belcher contends that trial counsel failed to adequately investigate and present evidence regarding his addiction to methamphetamine. This claim was insufficiently pleaded. Furthermore, the facts that Belcher pleads should have been presented in mitigation are both cumulative and a double-edged sword and, thus, if true, do not entitle him to relief. See, e.g., McWhorter, supra.

Counsel's penalty-phase opening statement painted a picture of Belcher "before he was on drugs," "who he was when he was on drugs," and "who he's become now that he's been in jail and he's sober" in a clear

82

effort to show that his actions on drugs were an anomaly and that he was now back to a "person whose life is worth saving." (TR. 1099.) Dr. Griffith testified that those with TBI often use drugs to cope. Dr. Griffith further testified that drug use could amplify TBI symptoms, making a person "more impulsive" and "more aggressive." (TR. 1114.) Consistent with the trial strategy, Dr. Griffith further testified that "recovery from methamphetamine is not as protracted in terms of brain disorders and brain dysfunction" and that one could recover and function normally. (TR. 1115.) Dr. Griffith's report, which was admitted into evidence, noted Belcher's drug use. Belcher reported "recreational" use of methamphetamine starting at age 26 and use of "cannabis and cocaine … in his 20's." (TC. 380.) Belcher, however, "admitted that his drug use had been a factor in his divorce." (TC. 381.) Belcher also admitted that he was "arrested for possession of a controlled substance" in 2013 and that he was "sentenced to complete a year-long program at Indian Rivers Mental Health Center," and, he said, he completed the program and the charges were dropped. (TC. 381.) Belcher "denied having been involved in any other substance use treatment programs." (TC. 381.) Belcher's father testified that he "did not realize the extent" of Belcher's drug use,

but that "his conversations got back to normal" after a few months in jail. (TR. 1145.) Belcher's father also wrote a letter that was admitted into evidence, explaining that Belcher became a methamphetamine "addict" after he lost custody of his daughter. Belcher's sister's letter was admitted, and, consistent with counsel's strategy, addressed what a great brother and father Belcher was before drugs destroyed his life and addressed their relationship, as well as stated that Belcher was being a great father and brother again since going to jail and ceasing his drug use. (TC. 399.) A letter from Belcher's aunt addressing similar topics was admitted, and she asked for prayers as they "try to heal the wounds that drug addiction has inflicted." (TC. 400.)

Clearly, additional evidence of Belcher's drug use would have been inconsistent with defense strategy. Counsel's penalty-phase strategy was to acknowledge his drug use but to emphasize the "good Belcher" before and after the drug addiction, which was clearly a strategic decision. It would have been inconsistent with the defense strategy to emphasize Belcher's voluntary drug use when it was just as likely to be considered an aggravating circumstance as a mitigating circumstance. As the circuit court found, "[e]vidence that Belcher was addicted to meth

84

and had criminal records relating to that addiction flies in the face of the defense's theory of mitigation." (TC. 827.) The circuit court recognized that trial counsel's mitigation strategy to not emphasize Belcher's methamphetamine addiction was reasonable and stated that "Belcher does not and cannot claim that no reasonable attorney in trial counsel's petition would have done the same." (TC. 827.) Moreover, "the same judge who presided over [Belcher's capital-murder trial also considered his postconviction petition," and "[w]e afford the experienced judge's ruling 'considerable weight.'" Washington, 95 So. 3d at 53.

Furthermore, the additional evidence emphasizing Belcher's drug problem would have been a double-edged sword. See, e.g., Davis v. State, 9 So. 3d 539, 566 (Ala. Crim. App. 2008). This is particularly true where, as here, there was little benefit to emphasizing his drug problem because Belcher pleaded no facts indicating that he was "substantially impaired" at the time of the offense so as to support the finding of a statutory mitigating circumstance under § 13A-5-51(6), Ala. Code 1975 ("[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired"), or § 13A-5-51(2), Ala. Code 1975 ("[t]he capital offense was

committed while the defendant was under the influence of extreme mental or emotional disturbance").[13]  His mere conclusion, unsupported by facts, that "[j]urors and [the trial] Court <u>may</u> well have concluded that this additional evidence of Mr. Belcher's intoxication, along with the evidence of his brain damage, supported the statutory mitigating circumstances" that he was "substantially impaired" and "under the influence of extreme mental or emotional disturbance" (C. 205) was insufficient.  Belcher never alleged that he was substantially impaired or under a "mental or emotional disturbance" at the time of the offense such that the additional facts he pleads would have elevated the consideration of his drug use from a nonstatutory mitigating circumstance to a statutory mitigating circumstance. And, emphasizing

---

[13]The trial court, in its sentencing order, noted Belcher's "drug usage on and during November 1 and 2, 2015, as well as drug usage and habits prior to those dates," but was not "convinced from the evidence that any such drug usage rises to the level of substantially diminishing the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, such that it is a statutory mitigating circumstance." (C. 49.)  Instead, the court found his drug usage to be "a nonstatutory mitigating circumstance." (C. 49.)  In his petition, Belcher pleaded no facts to show that his drug use substantially impaired him enough to qualify as a statutory mitigating circumstance.  Rather, he pleaded more evidence of drug use as a nonstatutory mitigating circumstance.

Belcher's drug use would have "painted Belcher as untruthful" based on his self-reporting of drug use to Dr. Griffith. (TC. 827.) See, e.g., Washington, 95 So. 3d at 53 ("'An ineffective assistance claim does not arise from the failure to present mitigation evidence where that evidence presents a double-edged sword.'" (Quoting Reed v. State, 875 So. 2d 415, 437 (Fla. 2004))), and Boyd v. State, 306 So. 3d 907, 926 (Ala. Crim. App. 2019) (holding that the circuit court did not abuse its discretion by failing to consider Boyd's substance abuse as a mitigating factor in the murder because it found that Boyd was not impaired at the time).

In addition, evidence of Belcher's drug use was admitted and additional evidence would have been cumulative. Indeed, the trial court expressly considered Belcher's drug usage as a nonstatutory mitigating circumstance, showing that the information pleaded was largely cumulative. As previously noted, counsel does not render ineffective assistance by not presenting cumulative evidence. See, e.g., McWhorter, supra.

Moreover, we note that some of Belcher's contentions, on one hand, amount to his faulting counsel for not retaining an expert to confirm that his deficits were based on TBI, but, on the other hand, are faulting

87

counsel for not retaining an expert to confirm that his deficits may have been caused by his drug use. For example, Belcher contends that counsel should have retained a psychopharmacologist to educate the jury about the effects of methamphetamine addiction, including brain damage, and, specifically, that Dr. Skolly Danziger would have testified that "brain damage from methamphetamine may also overlap with damage often seen from TBI." (Belcher's brief, p. 52.) However, this contention is directly at odds with Belcher's simultaneously held position that he was prejudiced because Dr. Griffith testified that Belcher's drug use could have contributed to his mild neurocognitive deficits, instead of limiting the cause of his deficits to TBI from head injuries caused by motorcycle accidents.

The circuit court properly summarily dismissed this claim because Belcher's argument is "inconsistent with the defense theory of the case or would have been otherwise cumulative." McWhorter, 142 So. 3d at 1237 (affirming the denial of postconviction relief because "[t]he circuit court found that defense counsel's strategy in mitigation was reasonable and that additional evidence presented at the postconviction hearing would have been cumulative to evidence presented by trial counsel or

would have been inconsistent with evidence presented to support trial counsel's reasonable strategy"). Belcher pleaded no facts, particularly considering the record, that suggested either deficient performance or that his sentencing outcome would have been different based on the presentation of the additional evidence.

F.    Counsel's Investigation and Presentation of Jail Behavior

Belcher also contends that his trial counsel failed to adequately investigate and present evidence of his good behavior since he had been in jail.

In Skipper v. South Carolina, 476 U.S. 1, 7 n.2 (1986), the United States Supreme Court recognized that "evidence of adjustability to life in prison," specifically, evidence that a defendant is "a well-behaved and disciplined prisoner," "unquestionably goes to a feature of the defendant's character that is highly relevant to a jury's sentencing determination." Belcher's trial counsel, in fact, presented this type of mitigating evidence at Belcher's trial. However, as with his other failure-to-investigate-and-present-mitigation-evidence claims, Belcher asserts additional, cumulative evidence of his good behavior and positive improvements in jail that, in hindsight, should have been presented. As

with all claims that <u>more</u> evidence should have been presented, we first consider what actually was presented.

Belcher's first penalty-phase witness was a guard from the Tuscaloosa Jail who was well acquainted with Belcher and testified that he was a "good" inmate who apologized the one time he broke the rules. Dr. Griffith also testified that Belcher could recover from his addiction to methamphetamine more quickly than one could recover from other brain injuries and that he could function normally. In fact, Dr. Griffith testified that there was nothing that would prevent Belcher from being able to live a "productive life in prison." (TR. 1117.) Belcher's father also testified that Belcher had made positive changes while in jail awaiting trial and that he was a good mechanic who could teach others. He further testified that Belcher had a good relationship with his daughter and tries to be a good father from jail. A family friend wrote, for the jury's consideration, that Belcher had "set up a Bible study in the jail" and was "attending the church services available and [wa]s making the most of his situation," "reading the Bible, studying, and reflecting," and had made her a cross bookmark. (TR. 1138.) Belcher's sister also testified that Belcher made "crosses" in jail. Belcher's mother testified

that Belcher had changed "greatly" in jail and was always praying and wanted her to take his daughter to church, that Belcher could lead Bible studies in prison, and that Belcher could teach mechanics to other people in prison. (See also TC. 411 (sentencing memo noted he was a "model prisoner" and "can contribute to the education of other inmates in prison in both Bible study and small machine repair"); TR. 1099 (penalty-phase opening noting Belcher's ability to teach and help other inmates).) Belcher also requested that the trial court instruct the jurors on the mitigating factors that Belcher was a "productive prisoner" and could "teach other prisoners mechanics and Bible Study." (TC. 405.) Moreover, as the circuit court found, "every family member that testified on Belcher's behalf testified that they have remained in contact with Belcher and support him" and that "[t]his evidence painted a positive adjustment picture for the jury" and "showed the jury that Belcher was making positive changes … and could take responsibility for his wrongful actions." (C. 831.)

Belcher now contends on appeal, as he did in his petition, that trial counsel should have called additional witnesses to testify about Belcher's exceptional behavior and positive changes in prison --

specifically, an addiction-recovery-class teacher, two Bible-study teachers, and an addiction counselor, all of whom worked with Belcher in jail. Belcher also asserts that Frankie Mann and Robert Henderson would have testified about Belcher's remorse.

Neither Belcher's petition nor his brief to this Court explains how reasonably competent counsel would have known about these additional witnesses, and, notably, Belcher did not plead that he had informed his counsel about these witnesses but that counsel had failed to follow up. "An attorney's decision regarding investigation depends 'critically' on information received from his or her client." Broadnax v. State, 130 So. 3d 1232, 1258 (Ala. Crim. App. 2013) (citing Strickland, 466 U.S. at 691). Moreover, the pleaded facts were largely cumulative. See, e.g., Marshall, 182 So. 3d at 596 ("'"'A lawyer can almost always do something more in every case. But the Constitution requires a good deal less than maximum performance.'"'" (citations omitted)). In addition, Belcher did not plead how the additional evidence would have changed his sentence. Belcher merely made the conclusory allegation that, had this additional evidence of positive changes been presented, "there is a reasonable probability that the jury would not have recommended …

92

death and that this Court would not have imposed that sentence." (TC. 200.) Finally, it is clear from the record that this largely cumulative evidence would not have changed the result. "Cumulative witnesses and evidence, even if true, would not have altered the trial court's opinion that death was the appropriate sentence in this case." Ferguson v. State, 13 So. 3d 418, 441 (Ala. Crim. App. 2008). Finally, Mann's and Henderson's proposed testimony that Belcher expressed "sincere remorse" while awaiting trial was significantly undermined, if not refuted, by Belcher's own testimony and demeanor at trial, which the postconviction judge, who was also the trial judge, observed firsthand; and the trial court expressly found that the nonstatutory mitigating circumstance of remorse did not exist.

We thus agree that this claim was properly summarily dismissed as being both insufficiently pleaded and without merit, particularly considering that the circuit-court judge also presided over Belcher's trial and sentenced him and was in the best position to consider any effect these allegations could have had on the jury's recommendation and his own sentencing determination.

## G. Counsel's Penalty-Phase Closing Argument

Belcher further contends that trial counsel's penalty-phase closing argument was deficient, pointing out that "more" could have been said regarding the various mitigating circumstances that had been presented at trial. The circuit court also properly summarily dismissed this claim as insufficiently pleaded and meritless. (C. 834.)

"It is well settled that closing argument is generally a matter of trial strategy." Clark v. State, 196 So. 3d 285, 315 (Ala. Crim. App. 2015). As the circuit court found, "[c]ounsel made a reasonable, strategic decision to focus on Belcher's potential, and he fails to plead that no other reasonable counsel would have made the same decision." (C. 834.) "Moreover, Belcher's claim that counsel's failure to highlight his lack of significant criminal history during closing argument robbed the jury of the opportunity to consider such evidence in mitigation is simply without merit." (C. 835.) "[W]hile counsel may not have mentioned such evidence in closing, the evidence was presented to the jury during instructions, and this Court weighed it at sentencing." (C. 835.) "Additionally, nowhere in his petition does Belcher plead what closing statement trial counsel should have given" instead. (C. 835.) Rather, Belcher merely

believed that all the mitigating evidence that had been presented during trial should have been highlighted during closing instead of counsel's focusing in closing on Belcher's positive present and future, in accordance with their theme, which was that Belcher's life was worth saving. See, e.g., Daniel v. State, 86 So. 3d 405, 440 (Ala. Crim. App. 2011) ("Daniel failed to plead what argument counsel could have made that would have resulted in a different sentencing recommendation in this case or how he was prejudiced; thus he failed to comply with Rule 32.6, Ala. R. Crim. P."). However, "'[t]he fact that this defense strategy was ultimately unsuccessful with the jury does not render counsel's performance deficient.'" Bush v. State, 92 So. 3d 121, 160 (Ala. Crim. App. 2009) (quoting Johnson v. State, 769 So. 2d 990, 1001 (Fla. 2000)).

### H. Prejudicial Effect of Counsel's Performance

Belcher's final penalty-phase ineffective-assistance-of-counsel argument is that, but for counsel's deficient performance, "individually and collectively," in the penalty phase, "there is a reasonable probability that jurors would not have sentenced [him] to death." (Belcher's brief, pp. 63-64.)

The circuit court properly summarily dismissed this claim "because no ineffective assistance of counsel has been shown." (C. 836.) The omission of the mitigation evidence that Belcher contends should have been presented does not indicate constitutionally ineffective assistance. Thus, "there is no individual or cumulative effect." (C. 836 (citing Taylor v. State, 157 So. 3d 131, 140 (Ala. Crim. App. 2010) (recognizing that no appellate court in Alabama had applied a cumulative-effect analysis to an ineffective-assistance-of-counsel claim but that, "even if a cumulative-effect analysis were required by Alabama law, that factor would not eliminate Taylor's obligation to plead each claim of ineffective assistance of counsel")).)

Second, the circuit-court judge, who also presided over Belcher's capital-murder trial, found that, considering the evidence presented at trial, Belcher had pleaded no facts that, if true, would have resulted in a different verdict or sentence. In short, "the allegedly omitted mitigation evidence would not have affected his decision that the aggravating circumstances outweighed the mitigating circumstances and mandated a death sentence." Washington, 95 So. 3d at 53. "We agree with the circuit court that the admission of this evidence [which was mostly cumulative,

negative, and inconsistent with the mitigation strategy employed by trial counsel] would not have changed the verdict in the penalty phase." Id. "'"'When a defendant challenges a death sentence ..., the question is whether there is a reasonable probability that, absent the errors, the sentencer -- including an appellate court, to the extent it independently reweighs the evidence -- would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'"'" Stanley v. State, 335 So. 3d 1, 55 (Ala. Crim. App. 2020) (citations omitted). "'"'To assess that probability, we consider the totality of the available mitigation evidence -- both that adduced at trial, and the evidence adduced in the habeas proceeding -- and reweigh it against the evidence in aggravation.'"'" Id. at 55-56 (citations omitted). We also "'"'consider the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied.'"'" Id. at 56 (citations omitted).

Here, upon considering the evidence Belcher contends counsel should have presented in mitigation, considering what trial counsel, in fact, presented at his trial, the strength of the evidence (which included Belcher's own testimony and overwhelmingly indicated his guilt), and

97

reweighing the evidence in mitigation against the evidence in aggravation, we agree that there is no reasonable probability that the additional mitigation evidence proffered by Belcher in his petition would have resulted in Belcher's receiving a different sentence.

## IV. Guilt-Phase Ineffective-Assistance Claims[14]

Belcher's fourth argument challenges the dismissal of his various claims that his counsel rendered ineffective assistance during the guilt phase of his capital-murder trial. We review these claims in accordance with the same legal principles that governed our review of Belcher's penalty-phase ineffective-assistance claims and hold that the circuit court properly summarily dismissed these claims, which were either insufficiently pleaded, meritless, or both.

---

[14]We also note that, in his petition, Belcher asserted an additional guilt-phase claim -- that the State improperly withheld exculpatory and impeachment evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972) -- which was also summarily dismissed by the circuit court. (C. 206-07, 837.) However, this claim was not reasserted in Belcher's brief on appeal and, thus, has been abandoned. See, e.g., Brownlee v. State, 666 So. 2d 91, 93 (Ala. Crim. App. 1995) ("We will not review issues not listed and argued in brief.").

## A.   Defense Theory

Belcher contends, as he did in his petition, that trial counsel were ineffective because they did not present evidence to show that his "codefendants were the ones who had beaten and killed [Samantha], [to] challenge the State's evidence suggesting Mr. Belcher was the ringleader, and [to] undermine the credibility of Steven George and Chylli Bruce." (Belcher's brief, p. 67; C. 67.)

In considering Belcher's guilt-phase claims of ineffective assistance of counsel, we first consider what guilt-phase theory and strategies were employed. In addition, as this Court recognized in Clark v. State, 196 So. 3d 285, 306 (Ala. Crim. App. 2015), "'[t]rial counsel's decisions regarding what theory of the case to pursue represent the epitome of trial strategy.'" (Quoting Flowers v. State, 370 S.W.3d 228, 232 (2010).) "'What defense to carry to the jury, what witnesses to call, and what method of presentation to use is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.'" Id. (quoting State v. Miller, 194 W. Va. 3, 16, 459 S.E.2d 114, 127 (1995)). Moreover, that a defense strategy was ultimately unsuccessful or that another alternative theory existed does not establish deficient performance, much less that

counsel's choices prejudiced the defendant. Indeed, "with the luxury of time and the opportunity to focus resources on specific facts of an already made record, postconviction counsel will inevitably be able to identify alternative defense theories that could have been pursued." Id. "However, we cannot view counsel's performance in hindsight. Rather, we must view counsel's decisions at the time they were made." Id. In this case, it is clear from the record that trial counsel's defense theory was reasonable and that it was reasonably presented to the jury.

During the guilt phase of his trial, "Belcher's defense was that, although he participated in the events that ultimately led to Samantha's murder, Steven was the person who actually killed her. Belcher testified on his own behalf" to this effect. Belcher, 341 So. 3d at 253. In addition, Belcher's counsel argued that Belcher did not have the requisite intent to kill Samantha and that, if Steven George had not stolen Samantha's car and set it on fire, "all of these events wouldn't have taken place." (TR. 1027.) Defense counsel's closing argument to the jury emphasized that five people were responsible for beating, binding, and placing Samantha in a trunk; that the State had not shown that Belcher intended Samantha to die because the knife, although it contained Belcher's DNA, belonged

100

to Steven George and did not have Samantha's DNA on it; that Steven George's clothes had Samantha's DNA on them; that there was no determination about how Samantha died; that only one witness noticed that Belcher's hands were tinted with blood but did not remember that until more than three years later when he testified at trial; that Chylli Bruce said that she did not know what had happened to Samantha until the State offered her probation to testify against Belcher; that Steven George also bargained for less time by blaming Belcher and his testimony "ain't worth much"; and that Steven George was the only person who benefited from Samantha's death. (TR. 1027-33.) See, e.g., Clark, 196 So. 3d at 316 ("'[C]losing argument is an area where trial strategy is most evident.'" (Quoting Flemming v. State, 949 S.W.2d 876, 881 (Tex. App. 1997))). Belcher's counsel further argued that Belcher could not be guilty of anything more than "felony murder." (TR. 1034.)

In sum, Belcher's postconviction contentions regarding alleged ineffective assistance during the guilt phase of his trial amount to nothing more than his belief that the same theory could have been presented more effectively, which will rarely establish either deficient performance or prejudice. Given the additional facts alleged here in light

101

of the trial record, Belcher's contentions fail, even if true, to satisfy either prong of <u>Strickland</u>.

### 1.   Failure to Implicate Belcher's Codefendants

Belcher asserted in his petition that Steven George had a motive to harm Samantha because she had rejected a previous sexual proposition, which he says could have been established from a cellular-telephone extraction and social-media interactions; that Steven George had previously slit a friend's throat and been "convicted of assault [2008], menacing [2012], trespass, and disorderly conduct [2014]" (C. 64-65); that Steven George stole four-wheeler parts from customers when he worked for Belcher; that Bruce was romantically interested in Belcher and "<u>may</u> have been motivated" to murder Samantha because of "jealousy"; that Bruce journaled that she prostituted and choked other women; that Bruce had been suspended from school "five times before she was expelled in 2015 for assaulting … a school employee (C. 69); that Bruce had been arrested for various thefts and had a juvenile record; and that Marcus George,[15] who played a "substantial role" in the murder, had

---

[15]"Steven George and Marcus George, both co-defendants in this case, are unrelated but share the same last name." (C. 708.)

prior convictions and confrontations with the police. (C. 72-73.) Belcher then concludes that "[i]f counsel had investigated and presented evidence that [his] co-defendants were the ones responsible for [Samantha's] death, there is a reasonable probability that he would not have been convicted of capital murder or sentenced to death." (C. 73-74.)

The circuit court properly summarily dismissed this claim for being both insufficiently pleaded and meritless.

As the circuit court recognized, trial counsel's primary defense theory was that Steven George killed Samantha, and this theory was clearly presented in opening statements. (C. 709 (citing TR. 414).) Steven George admitted at trial that he and Marcus George stole Samantha's car, that Steven George took the catalytic converter out of it, that Steven George stabbed a hole in the gas tank and took Samantha's gasoline, and that Steven George set Samantha's car on fire to destroy the evidence. (TR. 556-58.) "[C]ounsel also elicited an admission that it was Steven George's idea to steal Samantha's car and burn it, not Belcher's, and that Belcher was not involved at all in that event." (C. 709 (citing TR. 594).). In addition, trial counsel "elicited an admission that Steven George had stolen and destroyed two cars in the past for fun." (C.

709 (quoting R. 594-95).) Belcher's trial counsel then emphasized in guilt-phase closing arguments[16] that "these [Samantha's beating, kidnapping, and murder] wouldn't have taken place" but for Steven George's actions and that Steven George was the only person who stood to benefit from Samantha's murder. (TR. 1026-27, 1033.)

Based on the record, "Belcher's claim that counsel did not present a theory of motive that undercut Steven George's self-serving testimony is meritless on its face." (C. 709.) And, his contention that Steven George had an <u>additional</u> motive (other than to steal to support his drug habit and cover up the evidence) to kill Samantha because she had previously rejected his sexual proposition does not indicate deficient performance. <u>See, e.g.</u>, <u>Hunt v. State</u>, 940 So. 2d 1041, 1067 (Ala. Crim. App. 2005) ("'[T]he mere existence of a potential alternative defense theory is not enough to establish ineffective assistance based on counsel's failure to present that theory.'" (Quoting <u>Rosario-Dominguez v. United States</u>, 353 F. Supp. 2d 500, 513 (S.D.N.Y. 2005))).

---

[16]Belcher's trial counsel also emphasized Steven George's guilt in the penalty-phase closing arguments: "Mike's not the person who started this chain of events that ended up in Samantha's death. Steven George is." (TR. 1181.)

Belcher's allegation was also insufficiently pleaded because Belcher pleaded no facts to show how trial counsel's chosen theory -- that Steven George had the only motive to kill Samantha based on the criminal acts he committed on the night of the murder -- was unreasonable and how adding the additional theory that Steven George had once been rejected by Samantha would have led to a different verdict.

As for Belcher's arguments regarding prior bad acts committed by the codefendants that he believes counsel should have presented at trial, "Belcher fails to plead how evidence of such history could have ... been admitted in accordance with the rules of evidence." (C. 712.) Rule 608(b), Ala. R. Evid., provides that "[s]pecific instances of the conduct of a witness, for the purpose attacking or supporting the witness's character for truthfulness, other than <u>conviction</u> of crime as provided in Rule 609, Ala. R. Evid., may not be inquired into on cross-examination of the witness nor proved by extrinsic evidence." (Emphasis added.) Rule 609 further provides:

> "(a) General Rule. For the purpose of attacking the credibility of a witness,
>
> > "(1)(A) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was

105

punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and

"(B) evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and

"(2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of punishment.

"(b) Time Limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction … unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect."

In short, Belcher did not plead any facts to show how the "bad acts" evidence would have been admissible. Only prior convictions are admissible and only for the purpose of attacking a witness's truthfulness. See also Rule 404, Ala. R. Evid. ("Evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith."). Although Belcher pleaded that the other "bad acts" were additional evidence of "motive," he did not plead facts to show

106

their admissibility under the "motive exception" to Rule 404 or explain how they were material to <u>this</u> case, much less how they were more probative than prejudicial, particularly considering Steven George's and Bruce's plea agreements, in which they admitted their role in Samantha's kidnapping and murder. Moreover, "[e]vidence of juvenile or youthful offender adjudications is not admissible." Rule 609(d). Thus, the bad acts, arrests, and alleged juvenile record were inadmissible on their face.

In addition, although three of the prior bad acts Belcher alleged in his petition concern Steven George's alleged prior <u>convictions</u>, Belcher also pleaded no facts to show that this evidence would have been admissible. Specifically, Belcher contends that Steven George was convicted in 2008 for "assault and trespass," but he pleaded no facts that would show that this evidence should have been admitted as an exception to the general prohibition of crimes that occurred more than 10 years before Belcher's trial in 2019. <u>See</u> Rule 609(b). The other two convictions were in 2012, for "menacing," which is a Class B misdemeanor, <u>see</u> § 13A-6-23, Ala. Code 1975, and in 2014 for disorderly conduct, which is a Class C misdemeanor, <u>see</u> § 13A-11-7, Ala. Code 1975, and were, thus, inadmissible.

107

Belcher also pleaded that Marcus George's prior convictions should have been presented to the jury, but he never even alleged the date of those convictions; nor did Belcher attempt to explain "how the criminal history of a non-testifying codefendant would have been admissible under the rules of evidence." (C. 72-73, 719.) The circuit court thus properly summarily dismissed this claim as both insufficiently pleaded and meritless because "'[c]ounsel is not ineffective for failing to present evidence that is inadmissible.'" Thompson v. State, 310 So. 3d 850, 869 (Ala. Crim. App. 2018) (quoting McLaughlin v. State, 378 S.W.3d 328, 346 (Mo. 2012)).

In addition, some of the "bad acts" evidence Belcher claims counsel did not present was cumulative to evidence that was, in fact, presented at trial. For example, Bruce acknowledged suspensions for fighting other girls in addition to arrests and pending charges for stealing. Steven George acknowledged arrests for a stolen four-wheeler, DUIs, and drug charges. (TR. 544.) Bruce also admitted at trial that she had been involved in a sexual relationship with Belcher. (TR. 489-90, 499.) See, e.g., Saunders v. State, 249 So. 3d 1153, 1160 (Ala. Crim. App. 2016)

(holding that counsel is not ineffective for not presenting cumulative evidence).

Moreover, the allegation that counsel did not present all of the codefendants' motives to testify against Belcher is insufficiently pleaded because Belcher does not state how counsel should have known about the other charges or why they would have made a difference. There was ample evidence and arguments presented at trial about the highly favorable plea agreements that Chylli Bruce and Steven George made with the State in exchange for their testimony against Belcher. (TR. 414, 464, 495-96, 499, 584-85, 587, 1030-33, 1182.) Furthermore, Belcher pleaded no facts to show that the dismissal of additional, lesser charges would have indicated more bias and motivation than the plea agreements they made to receive lesser sentences for Samantha's capital murder.

Finally, Belcher pleaded no facts to explain how, if the jury had known this additional information, there is a reasonable probability that Belcher would not have been convicted or sentenced to death. (C. 720.) The circuit court thus properly summarily dismissed this claim.

2.    Failure to Challenge Belcher's "Ring-Leader" Characterization

Belcher also contends on appeal, as in his petition, that "trial counsel failed to investigate and present readily available evidence to rebut" the State's portrayal of him as the "ringleader" who provided everyone drugs.  (Belcher's brief, pp. 74-75.)  Belcher contends that he "had not manufactured methamphetamine for many months prior to this offense" and that counsel could have elicited testimony on cross-examination of Bruce and law-enforcement officers showing that Belcher had not been manufacturing drugs at the time and did not manufacture the drugs used on the night of the offense.  Belcher, however, did not plead any facts to show that Belcher told counsel this or explain how, even if true, his not manufacturing the drugs used that night would have resulted in his not being convicted or sentenced to death for Samantha's murder.

That Belcher did not "make" the drugs does not mean that he did not "supply" the drugs.  In addition, the only mention of Belcher's manufacturing methamphetamine came from Belcher himself, who testified that his father "kept accusing [him] of making drugs in the woods," and Belcher admitted that he had made methamphetamine in

the past for himself and had shared it with friends. (TR. 978, 984.) Bruce's testimony was simply that she and Belcher used drugs together and that the drugs came from Belcher that night, not that he "manufactured" them. (TR. 471.) More importantly, even if Bruce could have been impeached with a prior statement that Steven George actually supplied the drugs that night, Belcher pleaded no facts to show that merely because Steven George and Marcus George manufactured methamphetamine or because Steven George supplied the methamphetamine to the group that night, Belcher was somehow less culpable for his part in Samantha's murder. This evidence would have made no difference, particularly in light of Belcher's own testimony that the beating and kidnapping of Samantha began at his shop and continued to Belcher's car, home, and back to his car; that Belcher actively participated in the kidnapping, including putting Samantha back in the car when she escaped his moving car's trunk; and that he assisted in placing a badly beaten and "hog tied" Samantha in the woods. As the circuit court found, "Belcher's manufacturing was immaterial to the State's case." (C. 722.) And, as the circuit court also found, Belcher did not explain "how the jury would have drawn any meaningful distinction"

111

based on when and where and how much methamphetamine Belcher had manufactured or supplied. (C. 723.) Moreover, it was not unreasonable for counsel to not elicit further evidence regarding Belcher's drug use and manufacture of drugs, which, as already noted, was a double-edged sword.

Belcher's argument that his counsel failed to refute that he was the ringleader of this crime is also clearly without merit because it is refuted by the record. Counsel's theory was clearly that Steven George was the ringleader, and the best evidence of that was not that Steven George supplied the drugs, but that Steven George stole Samantha's car, removed a part and the gasoline, and set it on fire, which precipitated Samantha's beating, kidnapping, and murder. Trial counsel emphasized during the guilt phase of Belcher's trial that Steven George was the only person who stood to benefit from Samantha's murder. (TR. 1026-27, 1033.) He again emphasized Steven George's role as the "ringleader" in the penalty-phase closing arguments, stating: "Mike's not the person who started this chain of events that ended up in Samantha's death. Steven George is." (TR. 1181.) Contrary to Belcher's contentions, as the circuit court found, "that Steven George stayed at [Belcher's] home and used

[Belcher's] car and cellphone" would not have helped refute Belcher's role as ringleader but "would have strengthened the State's theory." (C. 725.)

For all these reasons, Belcher's contentions are both insufficiently pleaded and meritless.

3. <u>Failure to Impeach the Credibility of Bruce and Steven George</u>

Belcher further contends, as he did in his petition, that trial counsel should have impeached Bruce and Steven George with prior inconsistent statements. Belcher contends that Steven George made inconsistent statements, telling law-enforcement officers that he had no idea Samantha's body was in the trunk until they ran out of gas, that he stole her car on Belcher's orders, that he helped only because "Belcher threatened to kill him," that he put Samantha's catalytic converter in Belcher's dryer but at Belcher's trial did not state where he put it, that he provided conflicting accounts of who did what to Samantha, and that he did not trust Belcher and they had no relationship other than Steven George's having bought methamphetamine from Belcher. (C. 80-85.) Belcher then baldly pleaded that, had the jury heard "the many times that Steven George had lied," there is a reasonable probability that the jury would not have credited his testimony. (C. 86.) Belcher further

113

contended that counsel should have made the jury aware of the "full benefit" Steven George received for his testimony, such as not being prosecuted for the theft and destruction of Samantha's car.

As the circuit court found, Steven George's prior inconsistent statements were not favorable to Belcher. At trial, Steven George testified that he alone came up with the idea of stealing and burning Samantha's car and that he and Marcus George did this with no direction from Belcher. In an earlier statement, Steven George had said that this was all done at Belcher's direction. Likewise, Belcher complains that not enough was done to prevent the jury from thinking that he was the ringleader and a drug manufacturer; yet, in this claim, Belcher contends that counsel was ineffective for failing to introduce a prior statement that Steven George only knew Belcher because Belcher sold him methamphetamine. Steven George testified at Belcher's trial that he helped "hog tie" Samantha's wrists and feet and, then, behind her back, tied her wrists and feet together[17] and, further, that he then helped

---

[17]In his petition and brief, Belcher contends that Steven George testified at his trial that he "stood about three feet away" when Samantha was tied and bound but that he testified at Marcus George's trial that he helped "hog tie" Samantha. This contention is largely refuted. On direct examination at Belcher's trial, Steven George testified in detail about

114

Belcher put Samantha in the trunk of Belcher's car. Steven George further testified at Belcher's trial that he also helped Belcher "get [Samantha] out of the car" and "drag her in the woods." (TR. 572; C. 736.) Counsel cannot be ineffective for not presenting the jury with "confusing, and possibly harmful, evidence that would have contradicted the defense's own theory." (C. 735.) "[C]ounsel appears to have shielded Belcher from 'double-edged' testimony." (C. 736.) In sum, "it appears that counsel made the strategic decision to not impeach Steven George with his prior statements but, rather, [to] let him further implicate himself and Belcher's codefendants." (C. 736-37.) Counsel "limit[ed] Steven George's testimony to only that which was helpful to Belcher's defense. Belcher fails to explain how no reasonable attorney in trial counsel's position would have done the same." (C. 737.) Moreover, Belcher did

---

cutting the cable wire, getting the shoelaces, and assisting Belcher in tying Samantha. (TR. 564-66.). On cross-examination, however, Steven George stated that Belcher tied Samantha's hands and feet and that he was about three feet away. (TR. 598-600). Regardless, Belcher's jury heard Steven George testify about his participation in the binding of Samantha. And, to the extent that Steven George changed his story on cross-examination, this example illustrates why counsel would not have wanted to try to impeach Steven George when his direct testimony was consistent with the defense theory that he was the ringleader and cross-examination resulted, at least in this instance, in less favorable testimony.

not plead how, if trial counsel had highlighted these largely unfavorable inconsistences, the outcome of his trial would have been different. Nor would these facts, if true, have likely changed the outcome of Belcher's trial.

As for Steven George's plea agreement, "the jury was well informed about [it] and the possible impact that it had on his credibility." (C. 742 (citing R. 1032 (counsel's closing emphasized that death was taken off the table in exchange for George's plea)).) As the circuit court found, "Belcher fails to plead any facts explaining how evidence of the dismissal of [other, less significant] charges would have changed the result of his trial, when arguments that the witness avoided the <u>death penalty</u> by testifying, did not." (C. 742.) This is also true because the dismissal of any lesser charges was of little benefit to Steven George because it would not result in him serving a shorter time in prison when his plea agreement to the capital-murder charge required him to serve the rest of his life in prison. This claim regarding Steven George was properly summarily dismissed.

The circuit court also properly summarily dismissed Belcher's claim that counsel was ineffective for failing to impeach Chylli Bruce based on her allegedly inconsistent statements. Belcher contends that Bruce

initially denied knowing anything about Samantha or what happened to her, that she denied any romantic relationship with Belcher at trial (this contention is directly refuted by trial testimony that Belcher told Bruce he loved her and that they had a sexual relationship), that there were inconsistent details regarding the drug use in the group that night (specifically that, at Marcus George's trial, she testified that only Belcher used drugs; however, the circuit court found this to be refuted by the record from Marcus George's trial, at which she later testified that all of them were using drugs (C. 744)), that there were inconsistent details regarding which of Samantha's items were burned and in what, a pile or a barrel (the circuit court found that Bruce gave "substantially the same testimony" regarding the fire and burning of Samantha's items at both trials), that there were conflicting details of who walked into the woods with Samantha (although Belcher himself testified at trial that he and Steven George took Samantha out of the trunk of the car and "set her a few feet off on the edge of the woods in the bushes" (TR. 975)), that there were inconsistencies regarding what Samantha was bound with that night, and that there were inconsistencies about whether Belcher agreed with Marcus George's statement that they needed to kill Samantha (as

117

Bruce testified at trial) or rejected that idea (as Bruce stated in her previous statements to police).

The circuit court noted that Bruce was asked at trial about her prior statements and that she testified that she was not truthful before her plea agreement with the State. The circuit court found that "Belcher's failure to explain how trial counsel could have impeached Bruce with statements that she had already disavowed is fatal to his claim." (C. 745.) The circuit court further found that "it is clear on the face of the record that no material inconsistencies existed" and, thus, that "trial counsel cannot have been ineffective for failing to exploit them." (C. 747.) We agree and further note that Belcher testified at his trial and had an opportunity to refute any inaccurate statements, but he did not. Indeed, Belcher's testimony was substantially similar to the testimony of Steven George and Bruce. Belcher acknowledged that his codefendants were going to kill Samantha and simply told them: "Don't kill her here [at his shop]." (TR. 965.) According to Belcher, Steven George tied Samantha up on his own, but Belcher admitted telling George, "[w]e've got to get out of this" and that he "pick[ed] her up with Steven George." (TR. 966.) Belcher also admitted putting Samantha in his car and taking her to his

house. (TR. 966.) Belcher further admitted that he pushed "her back in the car" that he was driving and that he helped put Samantha in his trunk. (TR. 969, 971.) Belcher even admitted that he and Steven George took Samantha out of the trunk and "sat her a few feet off on the edge of the woods in the bushes." (TR. 975.)

Considering the relative insignificance of any inconsistencies in Bruce's testimony, as the circuit court found, "trial counsel cannot have been ineffective for failing to exploit them." (C. 747.) This is especially true because of the extremely damning testimony Belcher himself provided at trial. And, Belcher has never pleaded that, but for trial counsel's deficient performance, he would not have testified. Moreover, Belcher pleads no facts that would suggest a reasonable probability that, but for the inconsistencies in Steven George's and Bruce's testimony, the outcome of his trial would have been different.

As for Belcher's contention that trial counsel did not present Bruce's "full" motive to reach a plea agreement with the State and testify against Belcher, the circuit court stated:

> "Belcher fails to plead what, if any documentation of these crimes exists, how the alleged charges were disposed of, whether they were indeed linked to her plea deal in any way, or what her answers would have been had she been asked

119

'about her motive to provide favorable testimony.' … Thus, Belcher fails to plead facts that would show how trial counsel could have in fact impeached Bruce, or how it would have changed the result of the trial."

(C. 747.)

For all these reasons, this claim was both insufficiently pleaded and meritless.

## B.    DNA Evidence

Belcher next contends on appeal, as he did in his petition, that trial counsel failed to adequately challenge the State's evidence that his DNA was found on the silver Gerber knife that belonged to Steven George. According to Belcher, with more vigorous challenges, there is a reasonable probability that the jury would have discounted the evidence that his DNA was on the Gerber knife.

First, according to Belcher, trial counsel should have presented alternative explanations for why his DNA was on the knife handle, challenged the degree of probability that the DNA was Belcher's, and more vigorously challenged the presumptive evidence of blood on the knife. Belcher contends that an expert could have testified that it is "impossible" to know how a person's DNA came to be on a particular item and then speculates that, because the deputy who collected the item also

touched "a large number of items that could have had Belcher's DNA on them during his search of Mr. Belcher's car," there could have been a transfer of Belcher's DNA from another item onto the knife. (C. 95-96.)

Second, Belcher contends that counsel failed to present evidence or thoroughly cross-examine the State's expert to show that the DNA testing was prone to bias because the test was not blind but was conducted in reference to known DNA samples from "suspects," which, he says, "can yield a high rate of false inclusions" and can influence subjective judgments made during analysis. (C. 99-100.)

Third, Belcher contends that counsel should have more vigorously challenged the "presumptive presence of blood" and introduced "alternative explanations" that, instead of being the murder weapon, the knife could have been used to cut off Samantha's fingernails and/or that the knife could have animal blood on it because Steven George "used to work in deer processing." (C. 103.) According to Belcher, "trial counsel failed to challenge the complete lack of evidence supporting the State's theory that [Samantha] was killed by the Gerber pocket knife."

These contentions were insufficiently pleaded and without merit. As the circuit court noted, "the defense's theory was clearly that Belcher's

co-defendants were more culpable than him in Samantha's murder, and that Steven George was Samantha's ultimate killer." (C. 749.) Belcher's counsel relied on the State's DNA evidence to support their theory that Steven George was the killer, explaining in their opening statement, "what the DNA evidence does is say that Steven George is the killer because there's DNA evidence of Samantha Payne's blood on Steven George's shirt. … [Belcher's] DNA is excluded from that shirt." (TR. 413-14.) During their cross-examination of Inv. Richard Wilkins, Belcher's counsel elicited with clarity that all the State could say about the Gerber knife was that: one, it had Belcher's DNA on it; two, the expert could not determine whether Samantha's DNA was on the knife; three, "that knife was found with Steven George and not Michael Belcher"; and, four, it was merely "possible," based on Steven George's self-serving statements (provided to avoid the death penalty), that it could have been the murder weapon (even though the State was unable to determine cause of death). (TR. 807-08.) Belcher's counsel then emphasized, in the cross-examination of the State's DNA expert, that the major contributor of the stain on Steven George's t-shirt was Samantha and that Belcher was

expressly excluded as a contributor. (TR. 904-08.) Then, Belcher's counsel argued, in pertinent part, during closing arguments as follows:

"We have the Gerber knife that belonged to Steven George that was found on the side of the road by Steven George, by Chylli Bruce. Right there together. Steven George's knife by Steven George. The knife was presumptively positive for blood, but they can't say whether or not it was Samantha Payne's blood. Ladies and gentlemen of the jury, I submit to you, if that knife was stuck in a person, then there would be that person's DNA on that knife.

"But they can't tell you that Samantha Payne's DNA was on that knife 'cause it wasn't stuck in Samantha Payne. There were no stab wounds on Samantha Payne's body. The medical examiner testified he saw no indication that she had been stabbed. There were no marks on any bones that indicated that she had been stabbed, no marks on her body.

"So the State of Alabama presented to you this Gerber knife with Mr. Belcher's DNA on it. Maybe it's the murder weapon; maybe it's not. Maybe it's the knife. I don't know. The knife doesn't tell us anything about whether or not it was used to kill Samantha Payne, and it surely doesn't tell us that Michael Belcher intended for Samantha Payne to die.

"The State of Alabama has also brought you the jeans on South Sandy Road. The jeans that were, again, by Steven George and Chylli Bruce. That's where they were found. Not out in the woods, but up there with them where they were. And the knife went to the Hale County Jail with Steven George because all of these things were with Steven George. We have Steven George's clothes, his shirt with Samantha Payne's DNA on it, which was on Steven George, which went with Steven George to the Hale County Jail 'cause it was his.

"And then, of course, there was the cellphone with Samantha Payne's blood on it, her DNA, that was also with Steven George. So all the things that they've shown you to show you that Michael Belcher intended for Samantha Payne to die, actually Steven George had them. I think that that's important.

"And then we have Samantha Payne's decomposed body. Her body tells us nothing about how she died, nothing whatsoever. The medical examiner couldn't determine it. Don't know if she was stabbed. ... Sure don't know who stabbed her, if she was stabbed."

(TR. 1028-29.)

Based on the trial record, Belcher's counsel's performance was within the wide range of reasonable professional assistance. Belcher's trial counsel clearly relied on the State's DNA evidence to bolster their theory that Steven George killed Samantha, which was a particularly reasonable theory because there was far more DNA evidence that implicated Steven George than implicated Belcher. Samantha's DNA was found <u>only</u> on items that belonged to Steven George, and, although Steven George's knife had Belcher's DNA on it, the knife did <u>not</u> have Samantha's DNA on it; nor was it even determined that Samantha's death was caused by stabbing. Rather, Belcher's counsel elicited on cross-examination that, because Samantha's DNA was not found on the knife and because her cause of death had not been determined, it was

124

merely a "possibility" that the knife was the murder weapon, and this possibility was based on Steven George's self-serving statements. Indeed, the knife was found next to Steven George and processed with him when he was arrested, and Steven George's t-shirt tested positive for Samantha's DNA. Thus, the circuit court did not abuse its discretion by finding that "counsel executed a reasonable strategy concerning the DNA evidence." (C. 750.) Indeed, as the circuit court recognized, "[h]ad counsel undercut the validity of the DNA evidence, the defense could not have relied on this evidence to support its own theory." (C. 750.) "Without the DNA evidence, counsel would have been left with only Steven George's plea agreement and the fact that he stole Samantha's car to support the defense's theory." (C. 750.) Belcher pleaded no facts to show "how no reasonable counsel in trial counsel's position would have failed to undercut his own strategy by challenging the DNA evidence." (C. 750.)

We further note that some of the information that was elicited could have been regarded as speculative based upon defense counsel's cross-examination. For example, Belcher's counsel got the State's DNA expert to admit that she did not know "how DNA is deposited on items because

[she] was not there." (R. 900.) Belcher's petition also failed to explain the particulars of his proposed expert's opinions, including what alleles are, what happens when alleles are dropped, how much more or less closely the match could be based on dropping alleles. Nor does Belcher plead what questions should have been asked of the State's expert on cross-examination, what the witness would have said, and how that would have been beneficial. See, e.g., A.G. v. State, 989 So. 2d 1167, 1173 (Ala. Crim. App. 2007) (holding that ineffective-assistance claims were insufficiently pleaded when the petitioner did not plead what questions should have been asked and "how those questions" would have resulted in favorable testimony). In addition, Belcher's contention that another DNA expert could have undermined the State's expert's testimony is speculative and insufficient to show prejudice. For example, Belcher speculates that his DNA could have been transferred because someone touched other items Belcher touched. See, e.g., McMillan v. State, 258 So. 3d 1154, 1178-1179 (Ala. Crim. App. 2017) (affirming the dismissal of a postconviction claim based on speculation about what an expert "might have found").

Moreover, Belcher's contention that counsel failed to challenge the State's characterization of the knife as the murder weapon is refuted by both counsel's opening and closing arguments and cross-examination, as well as by the State's own closing argument that acknowledged that the State did <u>not</u> know the cause of Samantha's death. The State argued at trial: "Did she simply succumb to injuries … [f]rom the kicking, the beating, the stomping, … [d]id she die from exposure … [or was it] a knife to her neck? We'll never know." (TR. 1015.) As the circuit court recognized, it was clear that Samantha's DNA was not found on the knife and that presenting alternative theories about whose blood may been on the knife could have been damaging because it would have "implied that it was Samantha's blood on the knife." (C. 763.) "Thus, counsel appears to have made the strategic choice not to introduce evidence that it was indeed Samantha's blood on the knife, and Belcher fails to explain how no other counsel in trial counsel's position would have done the same." (C. 763.)

Finally, Belcher failed to plead, particularly based on the trial record and the circuit-court judge's firsthand observations of the trial (as he was also the trial-court judge), how, but for these alleged errors, there

127

is a reasonable probability that the result of his trial would have been different.

For these reasons, this claim was both insufficiently pleaded and meritless and was properly summarily dismissed. Moreover, Belcher's reliance on Hinton v. Alabama, 571 U.S. 263 (2014), to argue otherwise is misplaced. In Hinton, defense counsel was ineffective for failing to hire an expert because he had a mistaken belief that funds for an expert were not available and because "the core of the prosecution's case was the state experts' conclusion that the six bullets had been fired from the Hinton revolver, [which] effectively required a competent expert on the defense side." Id. at 273 (emphasis added). Here, however, the DNA evidence was not the "core" of the State's case. If anything, the DNA evidence presented at Belcher's trial was more supportive of Belcher's theory that Steven George murdered Samantha than the State's theory that Belcher was responsible for Samantha's death. Thus, Hinton does not support Belcher's argument that his trial counsel were ineffective.

C.   Cross-examination of Law-Enforcement Witnesses

Third, Belcher's entire appellate "argument" regarding counsel's cross-examination of law-enforcement witnesses is:

128

"Investigators Wilkins and Bryant, who conducted the State's investigation, admitted at trial that, after questioning Steven George, they never considered alternative theories of events other than those presented by Steven George. (TR. 717-18, 738-30.) As pled in the petition, counsel failed to cross-examine investigators on the ways in which they unreasonably limited their investigation by failing to: search the residences of Mr. Belcher's co-defendants and the abandoned trailer on Haysop Church Road where co-defendants testified the victim was brought (C. 104-05); recover numerous pieces of evidence, including Marcus George's vehicle, Chylli Bruce's knife and clothes, and a burn barrel where Ms. Payne's fingernails, jewelry, and clothes were allegedly discarded (C. 104-07); collect DNA samples from co-defendants Marcus George and Alyssa Watson (C. 107); submit numerous items for forensic analysis, including items used to tie Ms. Payne to the tree (C. 107-08); and photograph key pieces of evidence, including Ms. Payne's car while it was still located at the Harrisburg Bridge. (C. 107-08). Counsel also failed to question investigators about inconsistencies between the locations where evidence was found and the co-defendants' testimony. (C. 105-06); see United States v. Cronic, 466 U.S. 648, 656 (1984); Smith [v. Wainwright], 777 F.2d [609,] 617 [(11th Cir. 1985)].

"Had counsel cross examined law enforcement witnesses about the numerous gaps in the State's investigation, it would have introduced reasonable doubt about the State's case, and there is a reasonable probability that Mr. Belcher would not have been convicted of murder or sentenced to death. See Strickland [v. Washington], 466 U.S. [668,] 694 [(1984)]. Because Mr. Belcher's allegations regarding the gaps in the State's investigation are sufficiently pled and facially meritorious, he should have been entitled to an evidentiary hearing. See [Ex parte] Hodges, 147 So. 3d [973,] 976 [(Ala. 2011)]; [Ex parte] Land, 775 So. 2d [847,] 852 (Ala. 2000)."

(Belcher's brief, pp. 86-88.)

129

As the State asserts, because Belcher failed to present this Court with any argument showing how the circuit court erred when it summarily dismissed this claim of ineffective assistance of counsel, this argument does not comply with Rule 28(a)(10), Ala. R. App. P., and is, thus, waived on appeal. See, e.g., Wimbley v. State, 387 So. 3d 213, 231 (Ala. Crim. App. 2022).

Moreover, even if Belcher had not waived this argument, the circuit court properly dismissed this claim as being insufficiently pleaded because Belcher did not plead what questions should have been asked, what evidence could have been discovered, and how revealing these deficiencies and alleged inconsistencies in the investigation would have changed the outcome of his trial, particularly considering his own testimony at trial, the overwhelming evidence against him (including the hair and blood inside his vehicle's interior and trunk), and the fact that he has never argued or pleaded that he would not have testified but for counsel's deficiencies. See, e.g., A.G. v. State, 989 So. 2d 1167, 1173 (Ala. Crim. App. 2007) (holding that ineffective-assistance claims were insufficiently pleaded when petitioner did not plead what questions should have been asked and "how those questions" would have resulted

130

in favorable testimony). Furthermore, "'"'[t]he scope of cross-examination is grounded in trial tactics and strategy, and will rarely constitute ineffective assistance of counsel.'"'" Stanley v. State, 335 So. 3d 1, 37 (Ala. Crim. App. 2020) (citations omitted). Regardless, Belcher, at best, speculates that a more extensive cross-examination would have changed the result, and "[s]peculation is not sufficient to satisfy a [postconviction] petitioner's burden of pleading." Mashburn v. State, 148 So. 3d 1094, 1125 (Ala. Crim. App. 2013).

### D. Voluntary-Intoxication Defense

Belcher further contends, as he did in his petition, that his trial counsel were ineffective because they did not "present a voluntary intoxication defense, which could have negated the element of intent necessary for a conviction of capital murder, reducing the offense to manslaughter," and, more specifically, for not obtaining and presenting testimony "from an expert in psychopharmacology." (Belcher's brief, p. 88.) The circuit court properly summarily dismissed this claim as being both insufficiently pleaded and meritless. (C. 773.)

In dismissing this claim, the circuit court correctly noted:

"'[E]vidence that the defendant ingested alcohol or drugs, standing alone,' will not support an intoxication

131

defense. Pilley v. State, 930 So. 2d 550, 562 (Ala. Crim. App. 2005). Rather, 'there must be evidence that the ingestion caused a disturbance of the person's mental or physical capacities and that that mental or physical disturbance existed at the time the offense was committed.' Lee v. State, 898 So. 2d 790, 838 (Ala. Crim. App. 2001). See also Spencer v. State, 58 So. 3d 215, 231-32 (Ala. Crim. App. 2008); Harris v. State, 2 So. 3d 880, 910-12 (Ala. Crim. App. 2007). '[T]o negate the specific intent required for a murder conviction, the degree of the accused's intoxication must amount to insanity.' Whitehead v. State, 777 So. 2d 781, 783 [(Ala. Crim. App. 1999)]."

(C. 773-74.)

Considering the legal requirement that the degree of the accused's intoxication must amount to insanity to support an intoxication defense and manslaughter instruction, the circuit court properly recognized that Belcher's claim was insufficiently pleaded. In addition, it is notable that, although Belcher pleads that "[e]ffective counsel would have elicited testimony from [him] as to the extent of his drug use and the impact of methamphetamine on his mental state at the time of the crime, including his level of intoxication, and the psychoactive symptoms that he was experiencing" (C. 109-10), Belcher's postconviction counsel also

"fail[e]d to plead the amount of [methamphetamine] he took and its impact on his mental state at the time of the crime, as well as how his [methamphetamine] use would have justified an intoxication instruction. The bare allegation that Belcher ingested an unspecified amount of [methamphetamine]

132

during an unspecified period of time before the murder is not sufficient to establish that he was intoxicated to the point of insanity and unable to form intent to kill at the time of the murder."

(C. 774.) We agree with the circuit court that this claim was insufficiently pleaded and properly summarily dismissed. See, e.g., Mashburn, 148 So. 3d at 1126 (holding that Mashburn's bare allegations were not sufficient to establish that he was intoxicated to the point that he was unable to form intent because he "failed to allege how much methamphetamine he had taken, how much or what prescription drugs he had taken, or exactly when he had taken the methamphetamines and prescription drugs"), and Connally v. State, 33 So. 3d 618, 623 (Ala. Crim. App. 2007) (holding that Connally's claim that his intoxication was a viable defense to murder was insufficiently pleaded because he "failed to allege how much he had to drink the night of the crime, how long before the crime he had been drinking, or any other facts indicating that his alleged intoxication amounted to insanity").

As the circuit court held, Belcher's contention -- that Dr. Susan Skolly-Danziger could have testified "that it is likely that [he] was continuing to experience the psychoactive effects of methamphetamine on his functioning for many hours after he stopped using" -- is also

133

insufficiently pleaded. Specifically, the petition does not allege how much methamphetamine Belcher took and when (other than, at the latest, "late afternoon") Belcher took it. Moreover, the allegations are pure speculation that Dr. Skolly-Danziger would testify that Belcher was "likely" under the influence and that it was "likely" "he exhibited poor decision making, a lack of behavioral insight, and an indifference to consequences." (C. 111.) Moreover, Belcher never pleaded that his "likely intoxication" amounted to "insanity." Nor did Belcher plead any facts to suggest that, but for counsel's errors, there is a reasonable probability the outcome of his trial would have been different.

We further note that Belcher's contentions also appear to be refuted by the evidence presented at trial, particularly his own testimony. (See, e.g., TR. 955 (Belcher said that he was high but working on installing "a clutch basket" in a motorcycle), TR. 956-57 (Belcher was busy working other than stopping to get high), TR. 959 (Belcher "bl[e]w everybody off to go back to finish working on this motorcycle" because "[t]he customer was really rushing [him] to get it out"), TR. 969 (Belcher was capable of driving), TR. 970 (Belcher made the decision to get Samantha out of his car and leave), TR. 970 (Belcher was concerned about his car being in a

ditch and was able to use an old tire to push it out without "busting the radiator"), and TR. 979 (when picked up by a police officer later, Belcher said he had just "been riding around drinking with some friends" and "didn't want to admit I was using methamphetamine to a police officer").) Based on Belcher's testimony, there is no indication that he was substantially impaired, much less to a degree that amounted to insanity. As previously noted, "'[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.'" Washington v. State, 95 So. 3d 26, 52 (Ala. Crim. App. 2012) (quoting Jones v. State, 753 So. 2d 1174, 1191 (Ala. Crim. App. 1999)).

In sum, this claim was insufficiently pleaded and, considering the evidence presented at trial, meritless.

## E.    Failure to Object

Belcher's final guilt-phase ineffective-assistance-of-counsel claim begins with an argument that the State improperly used his "mug shot" during voir dire and ends with a general contention that trial counsel was ineffective for failing to object to "numerous other violations" of his constitutional rights at trial.  As for the "numerous other violations,"

135

Belcher merely cites his petition and offers no argument or citation to legal authorities. Belcher also fails to offer any explanation regarding how the circuit court's dismissal of these "numerous violations" was erroneous. Accordingly, as to these alleged violations, Belcher's brief does not comply with Rule 28(a)(10), Ala. R. App. P. Thus, these contentions are waived.

As for Belcher's one argument that "[c]ounsel failed to protect [him] from the State's prejudicial use of his mugshot during voir dire" (Belcher's brief, p. 91), this argument was dismissed by the circuit court because it was insufficiently pleaded. We agree with the circuit court.

Belcher recognizes that he raised the claim that the mug shot was erroneously used during voir dire on direct appeal. He argues, however, that this Court rejected this claim of error merely because "the record does not include a copy of the 'billboard' that was displayed to the jury." Belcher, 341 So. 3d at 255. However, this Court further noted that "[t]here is nothing in the record that suggests that the photograph of Belcher contained any criminal history." Id. at 256. "Nor is there any indication that the photograph related to a case separate from the one for which Belcher was on trial." Id. Interestingly, although we could not

find error because of counsel's failure to show any prejudice in the direct appeal of his conviction, Belcher's postconviction petition also did not include the photograph and, further, failed to plead any facts that, if true, would show that the "mug shot" was inadmissible and, thus, that trial counsel's failure constituted deficient performance and that Belcher was prejudiced by counsel's actions. Glaringly absent from Belcher's petition is any description of the "mug shot." As on direct appeal, Belcher provides no indication of whether the photograph was simply Belcher's head or face or included both a frontal and profile view. Likewise, there is no indication as to what Belcher was wearing, what the background looked like, or whether the photograph included a date that would have implied that Belcher had a prior criminal record. See, e.g., McNabb v. State, 887 So. 2d 929, 973 (Ala. Crim. App. 2001) (holding that there was "no error, plain or otherwise, in the admission of the mug shot" because, although "the State did not have a demonstrable need to introduce the mug shot," the photograph itself did not imply that McNabb had a prior criminal record and the manner in which the photograph was introduced did not draw attention to its sources or implications"). Moreover, Belcher later testified about his arrest and lack of knowledge as to how jail works

and admitted that, although he had been arrested before, he had "never been inside of a jail for very long." (TR. 982.)

### F. Counsel's Deficient Performance Was Prejudicial

Belcher also restates the claim in his petition that,

"[i]f counsel had presented a coherent and consistent defense throughout the trial, including that the co-defendant testimony was not credible, the State's investigation and forensic evidence was unreliable, and that Steven George and Chylli Bruce killed Samantha Payne, the jury would have assessed the relative culpability of Mr. Belcher and his co-defendants differently (C. 118-22), and there is a reasonable probability that [he] would not have been convicted of capital murder or sentenced to death."

(Belcher's brief, p. 93.) Belcher further restates his contention that "[t]hese errors, individual and collectively denied [him] his rights to effective assistance of counsel and due process." (Belcher's brief, p. 93.) However, Belcher makes no substantive argument addressing these contentions or the circuit court's summary dismissal of this claim. Thus, this claim is waived because it does not satisfy the requirements of Rule 28(a)(10), Ala. R. App. P. See, e.g., Woodward v. State, 276 So. 3d 713, 746 (Ala. Crim. App. 2018) (holding that Woodward's argument was waived because he "reassert[ed] this claim from his petition, but he made no argument regarding why he believe[d] the circuit court's findings were

138

incorrect").  Moreover, this claim has already been addressed and determined to have been properly dismissed in other sections of this Court's opinion.

## V.    Discovery Request

Belcher also contends that the circuit court erred by denying his request for "discovery and access to neuroimaging," which he filed before filing his petition.  According to Belcher, he was entitled to this prefiling discovery "because, under Alabama Code section 13A-5-53.1(h), he would not be able to amend his petition to add information obtained in discovery after filing" and, without this discovery, "restrictions on amendments created by the FJA would otherwise deny him meaningful ability to use discovery."  (Belcher's brief, pp. 93-94.)

In considering this discovery claim, we recognize that "'"[w]e will reverse a [circuit] court's denial of a postconviction discovery request only for an abuse of discretion."'"  Jackson v. State, 910 So. 2d 797, 802 (Ala. Crim. App. 2005) (quoting Ex parte Mack, 894 So. 2d 764, 768 (Ala. Crim. App. 2003), quoting in turn People v. Johnson, 205 Ill. 2d 381, 793 N.E. 2d 591, 275 Ill. Dec. 820, (2002)).  Moreover, "'"[a] trial court does not abuse its discretion in denying a discovery request which ranges beyond

the limited scope of a post-conviction proceeding and amounts to a 'fishing expedition.'"'" <u>Id.</u> It is equally well settled that, "[w]hen ascertaining whether discovery is warranted in a [postconviction] proceeding, the court must first determine whether the … petitioner has shown good cause for disclosure of the requested materials." <u>Jackson</u>, 910 So. 2d at 801 (citing <u>Ex parte Land</u>, 775 So. 2d 847 (Ala. 2000)).

Belcher contends that in his initial prefiling discovery motions, as well as in his renewed discovery motions after he filed his petition, "he detailed the records and testing that he needed in order to support specific anticipated claims." (Belcher's brief, p. 93.) Belcher does not, however, explain in his brief how his motions established "good cause" for discovery. Belcher also fails to explain how and why the "good cause" standard "must yield to the statutory structure of the FJA," other than stating that "pre-filing discovery would facilitate the purpose of the FJA to require earlier litigation and expedite review." (Belcher's brief, p. 94.) Accordingly, Belcher's claim is insufficient pursuant to Rule 28(a)(10).

Regardless, the circuit court did not abuse its discretion by denying Belcher's discovery request because Belcher did not demonstrate "good cause" for discovery. A "good cause" determination necessarily requires

consideration of sufficiently pleaded issues in a <u>filed</u> petition because postconviction discovery is not intended to support a "fishing expedition" but is, rather, "a means of vindicating actual claims." <u>Ex parte Land</u>, 775 So. 2d 847, 852 (Ala. 2000), <u>overruled on other grounds</u>, <u>State v. Martin</u>, 69 So. 3d 94 (Ala. 2011). The FJA did nothing to change Alabama's approach to postconviction discovery. Moreover, "good cause" cannot be shown for claims that are "insufficiently pleaded, procedurally barred, or meritless." <u>Morris v. State</u>, 261 So. 3d 1181, 1202 (Ala. Crim. App. 2016). Because "[w]e have held in the previous sections of this opinion that the circuit court did not err by summarily dismissing [Belcher's] claims," "it follows that [Belcher] did not meet the good-cause standard for obtaining postconviction discovery." <u>Id.</u> Thus, the circuit court did not abuse its discretion by denying Belcher's postconviction discovery requests.

## VI.   <u>The Fair Justice Act</u>

Belcher's final argument is that application of the FJA violated his "rights to due process, access to courts, and effective assistance of postconviction counsel because the time provided is simply inadequate to fully investigate all claims for postconviction relief." (Belcher's brief, p. 96.) Belcher further argues that "[t]he FJA's restrictions also violate

[his] right to equal protection because they arbitrarily apply only to death-sentenced prisoners and not to individuals with lesser sentences" and that the deadlines violate "separation of powers" principles because they "undermine the ability of courts to appropriately manage their dockets." (Belcher's brief, p. 97.) In support of his arguments, Belcher contends that "[t]he FJA dramatically altered the procedures for post-conviction review in capital cases by significantly shortening the time available to investigate and develop claims, ... prohibiting virtually all amendments after the petition is filed, ... and imposing arbitrary deadlines on circuit courts to rule ...." (Belcher's brief, pp. 95-96.)

We agree with the circuit court that this claim was insufficiently pleaded under Rules 32.3 and 32.6(b) and, thus, was properly summarily dismissed by the circuit court in accordance with Rule 32.7(d).

As the circuit court found, Belcher failed to plead any specific facts to show that his constitutional rights were violated by the application of the FJA to his petition. This is a particularly glaring insufficiency considering that the Alabama Supreme Court's opinion in Ex parte Marshall, 323 So. 3d 1188, 1199 (Ala. 2020), rejected nearly identical contentions by Belcher and other petitioners who had been sentenced to

142

death because they did not raise a justiciable controversy in that the claims were "largely hypothetical assumptions about the effect [of] the FJA." The Alabama Supreme Court concluded that the claims were "not ripe for adjudication ... because their claims are inherently fact-specific and must be raised within the context of their six individual Rule 32 proceedings." Id. Although Belcher has now raised these contentions in his individual postconviction proceeding, he has still failed to plead facts showing how his constitutional rights were specifically and particularly violated by application of the FJA.

Belcher alleged in his petition that "the COVID-19 pandemic has precluded [his] ability to adequately investigate and prepare his Rule 32 petition" because the rule of the Alabama Department of Corrections that required "suspension of in-person visitation ... substantially impeded counsel's ability to adequately communicate with [Belcher] and gather information" and to "conduct any expert evaluations of Belcher" and that many "offices from which records need to be obtained are closed or operating on a limited staff and thus unable to fulfill record requests in a timely fashion. In addition, critical witnesses live at a substantial distance from Alabama or are at high risk for severe COVID infection,

making in-person meetings unsafe." (C. 208-10.) However, Belcher has failed to explain how his investigation was unconstitutionally hampered, particularly considering that, as the circuit court stated in its dismissal order, "Rule 32 counsel was appointed to Belcher on April 10, 2019. Thus, Belcher had almost a full year <u>before</u> the state-wide shut down to investigate, with counsel, his Rule 32 claims." (C. 839-40 (emphasis added).) And, the FJA clearly states that "[p]ost-conviction remedies ... shall be pursued concurrently and simultaneously with the direct appeal." § 13A-5-53.1(b). Moreover, in-person court proceedings were not suspended because of the COVID-19 pandemic until March 13, 2020, see <u>Ex parte Brown</u> 368 So. 3d 951, 953 (Ala. 2022), giving Belcher 28 more days of investigation after his direct appeal was filed before any restrictions began, meaning that he actually had 338 days to investigate claims <u>before</u> any COVID-19 restrictions. In addition, in-person hearings resumed May 13, 2020, and jury trials resumed after September 14, 2020. <u>See</u> <u>id.</u> Meanwhile, Belcher filed his petition on May 12, 2021, almost one year <u>after</u> in-person hearings <u>resumed</u>. In total, Belcher's postconviction counsel had the benefit of 763 days to investigate postconviction claims between counsel's appointment and

144

the filing of his petition, and only 62 days of that time were during the suspension of in-person hearings. Furthermore, Belcher did not plead why, during the relatively brief period of COVID-19 restrictions, other means of investigation could not have been employed. See generally Ex parte Miller, 335 So. 3d 1151, 1155 (Ala. 2021) (recognizing in a civil case that the administrative orders issued in response to the COVID-19 pandemic did not extend the time frame in which a circuit court was permitted to rule upon a motion and also stating: "Nothing before us indicates that [he] could not have obtained the [information] ... by telephone, videoconferencing, teleconferencing, or other means," such as wearing masks and employing social distancing").

In sum, Belcher pleaded no facts to show that the FJA deprived him of effective assistance of counsel, violated his right to due process, violated his right to equal protection, or violated separation-of-powers principles.

## Conclusion

For these reasons, Belcher is due no relief on his postconviction claims, and the judgment of the circuit court is affirmed.

APPLICATION OVERRULED; OPINION OF AUGUST 22, 2025, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.

Windom, P.J., concurs in part and concurs in the result, with opinion, which Minor, J., joins. Kellum, J., concurs in the result. Anderson, J., recuses himself.

WINDOM, Presiding Judge, concurring in part and concurring in the result.

I concur with the main opinion, except for Parts II and VI. As to those parts of the main opinion, I concur only in the result.

Minor, J., concurs.